Robert F. MITCHELL, Individually, et
al., Plaintiffs–Appellees,

v.

LONE STAR AMMUNITION, INC., etc.,
et al., Defendants,

Day & Zimmerman, Inc., Etc. and
Norris Industries, Etc.,
Defendants–Appellants.

No. 89–6123.

United States Court of Appeals,
Fifth Circuit.

Oct. 3, 1990.

John R. Mercy, Norman C. Russell, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Tex., for Day & Zimmerman.

Mike A. Hatchell, Ramey, Flock, Jeffus, Crawford, Harper & Collins, Tyler, Tex., Dennis Weitzel, Robert T. Baskett, Burleson, Pate & Gibson, Dallas, Tex., for Norris.

Francis Scott Baldwin, Jack B. Baldwin, John Browning Baldwin, Baldwin & Baldwin, Marshall, Tex., for plaintiffs-appellees.

Before THORNBERRY, JOHNSON and SMITH, Circuit Judges.

JOHNSON, Circuit Judge:

Two servicemen were killed, and another was seriously injured, in the tragic explosion of a defective mortar shell. The surviving serviceman and the representatives of the deceased servicemen filed this personal injury diversity action against the manufacturers of the defective shell. A jury found appellants Day & Zimmermann, Inc., and Norris Industries, Inc., liable for the damages resulting from the explosion, and the district court rendered a judgment in favor of the plaintiffs. Day & Zimmermann and Norris Industries now appeal to this Court claiming various errors in the trial they received. Unable to find that the district court committed reversible error, this Court affirms the district court judgment.

## I. FACTS AND PROCEDURAL HISTORY

Robert Mitchell, Victor Salazar and Stephen Ray Hunt were privates in the United States Marine Corps. On May 15, 1986, they participated in routine military training exercises at Camp Lejeune, North Carolina. During exercises in the operation of 81mm mortars, the Marines fired several mortar shells down a firing range located on the Camp Lejeune grounds. After six rounds of mortar shells were fired without incident, the unthinkable occurred: on the seventh round, a defective mortar shell prematurely exploded inside the mortar tube. The blast sent a fire ball and a shower of debris over the unsuspecting Marines. Two of the Marines, Victor Salazar and Stephen Ray Hunt, were killed. The third Marine, Robert Mitchell, was severely injured—the explosion shattered the bones in his right leg.

A post-accident investigation conducted by technical experts affiliated with the Picatinny Arsenal revealed that the defective 81mm mortar shell was taken from manufacturing Lot LS–58–4. In this same Lot, the technical experts discovered four shells with cracks in their metal projectile bodies, and discovered numerous other shells with excessive voids in their explosive filler. The projectile bodies of the shells in this Lot were manufactured by Norris Industries. The explosive filler was inserted into the shells in a melt-pour operation at the Lone Star Army Ammunition Plant, operated under contract with the United States Government by Day & Zimmermann.

Based upon this investigation, and other information related to the cause of the explosion, the surviving serviceman and representatives of the deceased servicemen filed a lawsuit against Day & Zimmermann and Norris Industries.[1] The plaintiffs alleged that Day & Zimmermann and Norris Industries were liable under theories of negligence, strict liability and implied warranty. Jurisdiction was properly based upon federal diversity pursuant to 28 U.S.C. § 1332 (1982).[2]

Prior to trial, Day & Zimmermann filed a Motion for Summary Judgment, alleging that North Carolina law governed the lawsuit and barred the plaintiffs' claims. The district court denied this motion, and the lawsuit proceeded to trial in August 1989. After the completion of the plaintiffs' case, Day & Zimmermann filed a Motion for Directed Verdict, alleging that the evidence did not demonstrate the existence of a defect or negligence on the part of Day & Zimmermann. The court overruled this motion. At the conclusion of the evidence, Day & Zimmermann again presented its Motion for Directed Verdict. Again, the district court overruled the motion. On August 18, 1989, the jury returned a $2.8 million verdict in favor of the plaintiffs, apportioning thirty percent of the responsibility to Day & Zimmermann and seventy percent of the responsibility to Norris Industries. Day & Zimmermann filed a Motion for Judgment Non Obstante Veredicto, which the district court overruled. Norris Industries filed a Motion for New Trial, which the district court also overruled.

Day & Zimmermann and Norris Industries appeal the district court's judgment in favor of the plaintiffs on several grounds. First, both defendants claim that the district court erred in refusing to grant immu-

---

1. In their original complaint, Plaintiffs joined Lone Star Ammunition, Inc., a subsidiary of Day & Zimmermann, and three other parties as defendants with Day & Zimmermann and Norris Industries. Subsequently, all of the defendants except Day & Zimmermann and Norris Industries were dismissed from the lawsuit without prejudice.

2. The amount in controversy exceeded $10,000, the minimum amount permitted under 28 U.S.C. § 1332 at the time of the filing of this lawsuit in 1988. Plaintiff Robert Mitchell is a resident of the State of Indiana. Plaintiff Evelyn Salazar is a resident of the State of New Mexico, the state in which the decedent Victor Salazar was domiciled at the time of his death. Plaintiff Ruth Lindsey is a resident of the State of Kentucky, the state in which the decedent Stephen Ray Hunt was domiciled at the time of his death. Lone Star Ammunition, Inc., is incorporated under the laws of the State of Texas. Day & Zimmermann, Inc., is a Maryland corporation, and Norris Industries, Inc., is a California corporation. The three other original defendants were North Dakota, Maryland and Delaware corporations.

nity from liability under the government contractor defense. Second, both defendants argue that the district court erred in applying Texas law, and should have applied the more restrictive North Carolina law. Third, both defendants contend that the evidence on liability is insufficient to support the judgment in favor of the plaintiffs. Finally, Day & Zimmermann argues that the plaintiffs' counsel in closing argument voluntarily abandoned the plaintiffs' claim against Day & Zimmermann. This Court will examine each of these arguments in turn.

## II. DISCUSSION

### A. Government Contractor Defense

■ Day & Zimmermann and Norris Industries argue that the district court erred in refusing to grant immunity under the government contractor defense of *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In *Boyle,* the United States Supreme Court concluded that "state law which holds Government contractors liable for *design defects* in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." *Id.* 108 S.Ct. at 2518 (emphasis added). This conclusion was not particularly remarkable: it had little effect on the existing law in this Circuit, except to reject the *Feres* doctrine as the ideological basis for government contract immunity.[3] *See*

*McGonigal v. Gearhart Industries, Inc.,* 851 F.2d 774, 777 (5th Cir.1988). However, *Boyle* reinforced the established reasoning that the government contractor defense only applies in cases of defective design, not in cases of defective manufacture. *Bynum v. FMC Corp.,* 770 F.2d 556, 573 n. 21 (5th Cir.1985).

■ Sound principles of fairness support the distinction between design defects and manufacturing defects. It would be inherently unfair to expose a manufacturer to liability for a defective design that the Government not only specified, but knew was defective.[4] "[T]ort liability principles properly seek to impose liability on the wrongdoer whose act or omission caused the injury, not on the otherwise innocent contractor whose only role in causing the injury was the proper performance of a plan supplied by the government." *In re Agent Orange Products Liability Litigation,* 506 F.Supp. 762, 793–94 (E.D.N.Y.), *rev'd on other grounds,* 635 F.2d 987 (2d Cir.1980), *cert. denied sub nom. Diamond Shamrock Chemical Co. v. Ryan,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The primary purpose behind the formulation of the government contractor defense was to "prevent the contractor from being held liable when the government is actually at fault ..." *Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1478 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989).[5] However, the pro-

---

**3.** *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In *Feres,* the Court held that the Federal Tort Claims Act does not cover injuries to armed service personnel in the course of military service. The Court in *Boyle* rejected this *Feres* doctrine as the ideological source of the government contractor defense in part because the doctrine would produce results that are in some respects too broad. *Boyle,* 108 S.Ct. at 2517. If the government contractor defense prohibited suits against a manufacturer whenever *Feres* prohibited suits against the Government, then the defense would prohibit all service-related tort claims against the manufacturer. *Id.* The *Boyle* Court found that this result would unduly interfere with the operation of state law. "We see nothing to be gained by expanding the theoretical scope of the federal pre-emption beyond its practical effect ..." *Id.* at 2515 n. 3. Nonetheless, in seeking the extension of the government contractor de-

fense to circumstances in which the Government has *designed* the *manufacturing* process, Day & Zimmermann and Norris Industries essentially ask this Circuit to return to the *Feres* rule of prohibiting all service-related tort claims against the manufacturers of equipment under government contract.

**4.** This Court recognizes that the defense possibly applies, as well, where because of government requirements a product is designed not as defective, but nonetheless as dangerous, and could not serve its intended purpose if it were "safe" in the sense that a consumer-oriented product would be expected to be safe.

**5.** *See* Comment, *Government Contract Defense: Sharing the Protective Cloak of Sovereign Immunity After* McKay v. Rockwell International Corp., 37 Baylor L.Rev. 181, 191–92 (1985) ("A final reason recognized by the courts for permit-

tective shield in favor of the contractor collapses when the actions of the government contractor—and not those of the Government—produce the damaging defect. In such a situation, fairness dictates that a government contractor should not be permitted to escape liability by asserting the sovereign immunity of the Government. Thus, "federal law provides no defense to the military contractor that mismanufactures military equipment or that is *itself* ultimately responsible for the design defect." *Bynum,* 770 F.2d at 574 (emphasis added). *See McGonigal,* 851 F.2d at 777.[6]

■ In this case, the plaintiffs based their claim on alleged *manufacturing* defects: cracks in the projectile body of the mortar shell and voids in the shell's explosive filler. Plaintiffs maintained that the shell in question was dangerously defective, and did not conform to government specifications. The jury agreed, finding factually that the mortar shell did not conform to government design specifications. Under the law of this Circuit, the government contractor defense does not apply unless the contractor's product conforms to government specifications. A borrowed shield of sovereign immunity cannot protect a government contractor from liability for manufacturing defects. *See McGonigal,* 851 F.2d at 777; *Bynum,* 770 F.2d at 574.

The 81mm mortar shell in this case is unique from most of the defective products that the government contractor defense has shielded from scrutiny.[7] The mortar shell is, at least in part, an instrument of death: one of its primary purposes is to kill or to maim. Accordingly, the government specifications for the design of such mortar shells take on special importance. Comprehensive military specifications ensure that these lethal devices explode only at the proper time and under the proper conditions. In short, design specifications ensure that mortar shells destroy only intended targets, not innocent bystanders. When a manufacturer of mortar shells deviates from these critical specifications, the result can be—and has been here—particularly tragic. A manufacturer's miscue in the manufacturing process—failure to conform to government design specifications—cannot be insulated from tort liability.

■ Nonetheless, Day & Zimmermann and Norris Industries assert that the injury in this case in fact was the result of a design defect, not a manufacturing defect. They allege that the Government established precise specifications regarding the *design* of the mortar shell's *manufacturing* process. These specifications were ostensibly defective, because the government-approved assembly and inspection process could not prevent the distribution of faulty mortar shells and the Government would not permit Day & Zimmermann or Norris Industries to institute a more effective procedure.[8] According to the appellants' nov-

ting the government contractor to share in the government's immunity from suit is the inherent unfairness of subjecting an innocent manufacturer to enormous liability when the blame, if any, properly lies elsewhere."); Comment, *The Government Contractor Defense After* Boyle v. United Technologies Corp., 41 Baylor L.Rev. 291, 299 (1989) ("The government contract defense is founded on the theory that if a contractor manufactures a product according to government specifications, then fairness to the contractor demands that it be allowed to share in the government's privilege of immunity.").

**6.** In some cases, the government contractor would be liable for a design defect, as well as a manufacturing defect. For example, if the Government were not warned about the dangers in the use of the defective equipment, and the contractor knew of the dangers, then the government contractor defense does not apply. *Boyle,* 108 S.Ct. at 2518.

**7.** *See, e.g., Boyle,* 108 S.Ct. 2510 (1988) (military helicopter); *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990) (F–16A fighter aircraft); *Bynum v. FMC Corp.,* 770 F.2d 556 (5th Cir.1985) (cargo carrier).

**8.** The United States Army prepared the military specifications for the load, assemble and pack operation of the mortar shell in question. Based on these specifications, the Army Safety Division of the United States Government approved the Standard Operating Procedure for the proper assembly of 81mm shells. In addition, the Government approved the inspection plan for the manufacture of the shells. Norris Industries claims that it asked the Government to authorize the alteration of the inspection plan from a sampling procedure to a 100% magne

el argument, the possibility that defectively manufactured products might escape through this Government assembly and inspection process gives rise to the protective *Boyle* government contractor defense, *i.e.*, the manufacturing process is a "design" within the comprehension of the Supreme Court in *Boyle*.

■ This argument that the government contractor defense applies to defects in the design of a product's manufacturing process misconceives the significant distinction between manufacturing and design defects. The district court in this case charged the jury that it must return a verdict in favor of Day & Zimmermann and Norris Industries if it finds that the manufacturers produced a product that satisfied government design specifications. The jury found the manufacturers liable precisely for the reason that the mortar shell failed to conform

to these specifications. "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1321 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). It is irrelevant that the Government, in some remote manner, might share responsibility for the dangerous defect. If a government contractor mismanufactures military equipment, then it is not entitled to an immunity from liability.[9]

■ In determining whether a defect is one of "design" for purposes of the government contractor defense, "the proper focus is the protection of discretionary government functions for which the defense is intended." *Harduvel*, 878 F.2d at 1317.[10] The government contractor defense indis-

---

particle inspection process, but the Government did not respond to the request.

9. Because of the potential of the government contractor defense to displace large chunks of the states' traditional prerogative over tort law, the defense must be applied with caution. "Displacement will occur only where ... a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' ... or the application of state law would 'frustrate specific objectives' of federal legislation ..." *Boyle*, 108 S.Ct. at 2515. Already, this Court has declined to extend the government contractor defense to a *situation in which there was no uniquely federal interest. See Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1486 (5th Cir.) (concluding that a "mere rubber stamp" by a federal procurement officer does not constitute government approval sufficient for application of the government contractor defense), *cert. denied,* —— U.S. ——, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). Likewise, this Court declines to extend the defense unnecessarily in this case.

10. Day & Zimmermann and Norris Industries argue that the case of *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir.1989) (Powell, J., sitting by designation), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990), dictates a contrary result in this opinion. In *Harduvel*, the widow of a Air Force captain filed suit against the manufacturer of an F–16A fighter aircraft after the plane which her husband piloted mysteriously crashed into a Korean mountain ridge. The trial court awarded a substantial judgment in favor of Mrs. Harduvel, on the basis of a jury verdict accepting the plaintiff's opinion that her husband's F–16A suf-

fered a massive electrical failure resulting from "wire chafing"—the rubbing of wires in the electrical system against other wires, fasteners or structural parts. The Eleventh Circuit reversed, holding that the wire chafing was the result of a design defect and not a manufacturing defect. Refusing to adopt the Florida state law presumption of manufacturing defect, the court concluded as a matter of federal common law that a manufacturing defect consists only of "aberrational" defects, and not those that occur "throughout an entire line of products ..." *Id.* at 1317. Since examples of wire chafing were common in the F–16A line, the Eleventh Circuit held that the government contractor defense was applicable.

This Court, however, believes the Eleventh Circuit's reasoning that manufacturing defects consist only of aberrational defects is unfortunate. One can certainly conceive of situations in which a manufacturer's shoddy workmanship—neither approved nor authorized by the Government—produces a defect that occurs throughout an entire line of products. Indeed, the defect in the present case appeared throughout the same Lot of mortar shells as the shell that killed Marines Salazar and Hunt. Defects of this nature are clearly a result of the manufacturing process, not the design process. In such situations, no federal interest would support the extension of the government contractor defense. In this Court's opinion, the relevant inquiry is the degree of the manufacturer's responsibility for the defect in question. Indeed, the Eleventh Circuit in *Harduvel* recognized the validity of this inquiry. *Id.* at 1321 ("To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured.").

putably shields a manufacturer from liability for defects authorized by the Government, because there is a strong federal interest against a system that would hold a manufacturer secondarily liable for mistakes or intentional design specifications on which the Government can claim its mantle of sovereign immunity. However, if a defect is the result of shoddy contractor workmanship, no federal interest justifies an immunity from liability. Consequently, the manufacturer's liability depends in large part upon its responsibility for the defect in question. The measure of this responsibility is the extent to which the manufacturer followed government design specifications. If the manufacturer's product does not conform to government design specifications, the defect is one of "manufacture." On the other hand, if the manufacturer's product is defective, notwithstanding an exacting conformance to government requirements, the defect is one of "design." In either event, the defect may produce unintended and unwanted results: the only question is whether the Government may be said to have "authorized" the defective condition, in spite of the possible results.

The Supreme Court in *Boyle* specifically recognized this distinction between manufacturing and design defects. In framing the elements of the government contractor defense, the Court ensured that the defense would only apply when a contractor's product conformed to government design specifications:

> Liability for *design defects* in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to

those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 108 S.Ct. at 2518 (emphasis added). The first two of these elements describe the nature of a design defect. "[T]hey assure that the *design* feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* (emphasis added).[11] Thus, by its express terms, *Boyle* does not apply unless the Government has authorized a specific defective condition in the *design* of a product, as opposed to a defective condition in the *manufacturing process.*

In the present case, it is apparent that the Government did not authorize that 81mm mortar shells contain cracks in the projectile body or excessive voids in the explosive filler. The Government contract with Day & Zimmermann specifically prohibited filler voids in excess of $\frac{1}{32}$ of an inch. The Government contract with Norris Industries contained no "acceptable failure rate" provision, indicating that the Government would not tolerate any cracks in the projectile body of the mortar shells.[12] The very fact that the Government approved an inspection procedure, however ineffective, evidences the Government's intolerance for these types of faulty conditions. Day & Zimmermann and Norris Industries cannot insulate their failure to conform to the Government's design specifications in the cloak of the government contractor defense. Accordingly, this Court cannot conclude that the district court erred in refusing to hold that the government contractor defense was avail-

---

11. The first two elements "assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated ..." *Boyle*, 108 S.Ct. at 2518. This states nothing more than the established fact that the Government must ultimately be responsible for the defect. *Trevino*, 865 F.2d at 1478.

12. The fact that the Government did not prescribe an acceptable failure rate does not preclude a finding that Norris Industries failed to conform to government specifications. The jury was perfectly capable of determining that

the absence of an acceptable failure rate amounted to an implicit specification that the shells not contain projectile body defects, particularly since there was testimony at trial that cracks in the projectile body of the mortar shell would breach government specifications.

As the government contractor defense is an affirmative defense, Norris Industries had the burden to establish that the defects in question were design defects. It apparently failed to do so to the satisfaction of the jury.

able to Day & Zimmermann and Norris Industries.

### B. *Choice of Law*

Day & Zimmermann and Norris Industries argue that the district court erred in applying Texas' law of tort liability. Appellants maintain that the district court should have applied the North Carolina statute of repose and granted summary judgment in the appellants' favor. The North Carolina statute of repose provides that no action for personal injuries resulting from a defective product "shall be brought more than six (6) years after the date of initial purchase for use or consumption." N.C.Gen.Stat. § 1–50(6) (1979).[13] Texas law contains no comparable prohibitive provision.

■ In a diversity action in federal court, the district court is required to follow the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Texas has adopted the "most significant relationship" approach detailed in sections 6 and 145 of the Restatement (Second) of Conflict of Laws. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979). Under this approach, "in all choice of law cases, except those contract cases in which the parties have agreed to a valid choice of law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984).

In applying the most significant relationship test, this Court must first identify the relevant state contacts. The following state contacts are present in this case: Appellee Robert Mitchell is a resident of the State of Indiana; decedent Victor Salazar was a resident of the State of New Mexico; decedent Stephen Ray Hunt was a resident of the State of Kentucky; Day & Zimmermann is a Maryland corporation which does business in the State of Texas; Norris Industries is a California corporation which does business in the State of Texas; the premature explosion of the mortar shell occurred in the State of North Carolina; the defective shell was completed in the State of Texas and placed into the stream of commerce in the State of Texas.

■ It is not sufficient merely to isolate the state with the greatest number of contacts. The application of the most significant relationship approach to the resolution of choice of law questions does "not turn on the number of contacts, but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6 [of the Restatement]." *Gutierrez*, 583 S.W.2d at 319.[14] Thus, after identifying the states with relevant contacts, this Court must identify the policies or governmental interests of each state in the controversy in question. Of the multitude of states with a relationship to the parties and occurrence in question, only Texas and North Carolina need be considered—the parties have only asserted the applicability of the laws of these two states.

■ North Carolina has little governmental interest in the resolution of the parties' claims and defenses. Its statute of repose was enacted to shield North Carolina manufacturers from open-ended liabil-

**13.** All parties seem to agree that if North Carolina law applies, the plaintiffs' claims are barred.

**14.** Section 6, in its entirety, states:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.
Restatement (Second) of Conflict of Laws § 6 (1980).

ity that might exist for an indefinite period of time after a product is sold and distributed. *Tetterton v. Long Manufacturing Co.*, 314 N.C. 44, 332 S.E.2d 67, 74 (1985). However, there is no North Carolina manufacturer involved as a defendant in this lawsuit. No compelling reason exists why the North Carolina legislature would have an interest in the application of its statute of repose to eliminate the claims of foreign plaintiffs against foreign defendants. *Cf. Duncan*, 665 S.W.2d at 422.

Texas, on the other hand, has a substantial interest in the resolution of the parties' claims and defenses. The Texas legislature and courts have developed an almost paternalistic interest in the protection of consumers and the regulation of the conduct of manufacturers that have business operations in the state. *See Dow Chemical Co. v. Alfaro*, 786 S.W.2d 674 (Tex. 1990). The expansive Texas system of tort liability for defective products serves as an incentive to encourage safer design and to induce corporations to control more carefully their manufacturing processes. *Baird v. Bell Helicopter Textron*, 491 F.Supp. 1129, 1141 (N.D.Tex.1980). This interest is particularly strong when the defective product in question was manufactured and placed in the stream of commerce in the State of Texas. *Melton v. Borg–Warner Corp.*, 467 F.Supp. 983, 986 (W.D.Tex. 1979).

Upon review of the respective interests of the States of North Carolina and Texas, it appears that Texas has the greater interest in the parties' claims and defenses. Under the most significant relationship test, Texas law was properly applied. Therefore, this Court is unable to find that the district court erred in its choice of law analysis.

### C. *Sufficiency of the Evidence*

Day & Zimmermann and Norris Industries argue that the evidence was insufficient to support the jury's verdict against them. As an appellate court, this Court's "sole function is to ascertain whether there is a rational basis in the record for the jury's verdict; we are forbidden to usurp the function of the jury by weighing the conflicting evidence and inferences and then reaching our own conclusion." *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1288 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

### 1. *Day & Zimmermann*

Day & Zimmermann maintains that the district court erred in overruling its motion for directed verdict and its motion for judgment notwithstanding the verdict. In both of these motions, Day & Zimmermann contended that the evidence was insufficient to support a finding that the mortar shell was defective as a result of voids in the explosive filler. Further, Day & Zimmermann contended that the evidence was insufficient to support a finding that Day & Zimmermann's actions were a causative factor in the plaintiffs' injuries.

■ This Court applies the same standard of review to the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict. *Long v. Schultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir.1989). Examining the record in the light most favorable to the party opposing the motion, this Court will reverse the district court's judgment only if it finds that there was no conflict in substantial evidence such that reasonable and impartial minds could differ, thus creating a question of fact for a jury. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). This Court is not inclined to disturb the reasoned decisions of six individuals who personally heard all of the evidence and viewed the demeanor of all of the parties. To justify reversal, the evidence must so overwhelmingly favor the moving party that "no reasonable jury could have arrived at the disputed verdict." *Long*, 881 F.2d at 132.

■ In the present case, Day & Zimmermann has failed to persuade this Court that no reasonable jury could have arrived at the disputed verdict. The plaintiffs produced credible evidence that only two conditions could conceivably have caused the tragic explosion of the 81mm mortar shell: cracks in the projectile body and voids in

the explosive filler. A large quantity of evidence described the potential danger of either of these conditions. In particular, there was significant evidence to support the conclusion that voids in the explosive filler contributed to the explosion. Master Gunnery Sergeant Mark Barton, an explosive ordinance disposal technician, testified by deposition that the most likely cause of the mortar shell explosion was air pockets in the explosive filler. Another expert witness, Elliot Mitchell, testified that a large void could create conditions favorable for a premature explosion of a mortar shell. The Pick and McPartland study, introduced by the plaintiffs, recounted an earlier premature explosion resulting from the adiabatic compression caused by an excessive filler void.

Other evidence suggested the existence of filler voids large enough to create an unacceptably dangerous condition. Plaintiffs introduced the Picatinny Report, which disclosed the existence of three shells from the same Lot as the defective shell, each of which contained voids in excess of the acceptable maximum of $\frac{1}{32}$ of an inch. In addition, a post-accident military inspection of the shells from the same Lot as the defective shell disclosed the presence of 573 shells containing voids that failed to meet. Government requirements. At least twenty-seven of these 573 shells contained filler voids in excess of an inch in diameter, a length which one expert witness described as highly likely to cause a premature explosion.[15]

Since it is undisputed that Day & Zimmermann manufactured the explosive filler of the defective shell in question, the jury could reasonably have determined that Day & Zimmermann's product contributed to the premature explosion that killed Marines Salazar and Hunt.[16] The jury finding that voids in the explosive filler caused thirty percent of the plaintiffs' injuries is not unjustified. Given additional evidence of the existence of dangerous cracks in the projectile body of the mortar shell, the jury could fairly have determined that the premature explosion occurred as result of the unsafe combination of metal cracks and filler voids.

Plaintiffs adduced sufficient evidence at trial to support a finding of Day & Zimmermann's liability. Accordingly, this Court is unable to conclude that the district court erred in failing to grant Day & Zimmermann's motion for directed verdict or motion for judgment notwithstanding the verdict.

### 2. *Norris Industries*

Norris Industries argues that the district court erred in failing to grant a motion for new trial. The gravamen of Norris Industries' complaint is that the evidence at trial was insufficient to support the jury's finding that the mortar shell in question was defective as the result of a crack in the projectile body. Norris Industries asserts that the plaintiffs' evidence at trial raised only the mere possibility of liability, and not the factual probability of liability.

■■■ The standard of review of a district court's denial of a motion for new trial is different from that of the denial of a motion for directed verdict. *Long,* 881 F.2d at 132. "The decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or misapprehension of the law." *Dixon v. International Harvester Co.,* 754 F.2d 573, 586 (5th Cir.1985). This deferential standard applies especially in cases in which the district court has denied the motion for

---

**15.** Day & Zimmermann complains that the testimony of Elliot Mitchell and Sgt. Mark Barton was offered by appellant Norris Industries after the conclusion of plaintiffs' case, and therefore should not be considered in support of the district court's denial of the motion for directed verdict. However, the plaintiffs offered the Pick and McPartland study, the Picatinny Report and the post-accident military investigation during their case-in-chief. Even if this evidence were impeachable, it constituted some evidence on which a jury could reasonably rely. Thus, the evidence was sufficient to avoid a directed verdict.

**16.** This Court need not address the contention that there was insufficient evidence to support the jury's finding of Day & Zimmermann's negligence, because we conclude that the jury verdict of damages is supported by the evidence demonstrating liability for a product defect.

new trial. *Id.* In the present case, this Court cannot conclude that the district court abused its discretion.

 At trial, numerous experts testified that cracks in the projectile body of the 81mm mortar shell were the most likely cause of the tragic explosion at Camp Lejeune. The plaintiffs' expert witness, Dr. John Hoffman, testified that a defect in the metal of the projectile body was the most likely cause of the premature explosion. The three individuals who participated in the military investigation of the explosion—Roger Wong, Karl F. Lukens, Jr. and James V. Rinnavatore—all agreed in depositions that metal cracks were the most likely cause of the accident. Finally, Melvin Eneman, an expert called by Day & Zimmermann, testified that the most likely cause of the explosion was defects in the metal components of the projectile body.

 Norris Industries argues that this Court should ignore these expert conclusions, because they are allegedly based on "hearsay and egregiously skimpy data." Essentially, Norris Industries asks this Court to substitute a new finding of fact for that already returned by the jury in this case, simply on the basis that these expert conclusions are subject to debate. This Court, however, "is not free to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury." *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 308 (5th Cir.1989), *cert. denied*, ── U.S. ──, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990).[17] It is the jury's province to determine whether expert testimony rests upon tenuous evidentiary inferences and weak scientific or engineering data. This Court merely ascertains whether the evidence, in the light most favorable to the party against whom the motion is made, satisfies the minimum threshold of sufficiency. In the present case, the unequivocable conclusions of five witnesses that the most likely cause of the premature explosion was cracks in the projectile body of the mortar shell persuades this Court that the evidence was sufficient to support a finding of Norris Industries' liability. Thus, this Court is unable to conclude that the district court abused its discretion in denying Norris Industries' Motion for New Trial.

### D. *Abandonment of Claim*

 Day & Zimmermann contends that the plaintiffs' attorney voluntarily abandoned the plaintiffs' claim against Day & Zimmermann, because the attorney stated on one occasion in closing argument that Norris Industries was one hundred percent at fault in causing the premature explosion of the mortar shell. It is clear, however, that the plaintiffs' attorney did not make an admission of fact; rather, the attorney proffered no more than his opinion of the application of the law to the facts. "Oral argument ... does not come within the category of deliberate admissions of record during the trial." *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912, 917 (7th Cir.1953). This Court will not bind the plaintiffs to an innocent statement of their attorney made during the heat of closing argument.

## III. CONCLUSION

This Court is unable to conclude that the district court erred in its application of the government contractor defense and choice of law rules. Further, we cannot conclude that there was insufficient evidence to support the jury's verdict, or that the plaintiffs' attorney voluntarily abandoned a claim against one of the defendants. For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

**17.** Norris Industries argues that *Brock* permits appellate courts to look behind the conclusions of expert witnesses in determining the sufficiency of the evidence. By its express language, the holding in *Brock* at least arguably applies only to "mass toxic tort" cases, because of the "growing realization among academics, lawyers, and judges that cases such as this present special problems and challenges to traditional ideas regarding the role of the jury as a decisionmaker." 874 F.2d at 309. However, at this time, this Court need not determine the scope of the *Brock* opinion. There is ample expert testimony in the record to support the jury verdict.