United States Court of Appeals,

Fifth Circuit.

No. 92-2184.

Penny BAILEY, Individually and as Next Friend of Elizabeth Bailey and Bryan Bailey, Minors, and as Personal Representative of the Estate of John Bailey, Deceased, Plaintiffs-Appellants,

v.

McDONNELL DOUGLAS CORPORATION, Defendant-Appellee.

April 29, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before DUHÉ and BARKSDALE, Circuit Judges, and HUNTER, Senior District Judge.[1]

BARKSDALE, Circuit Judge:

At issue in this second appeal of this Texas product liability action is the effect of the government contractor defense, as formulated in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), when claims of both manufacturing *and* design defects are asserted. Penny Bailey appeals the summary judgment awarded McDonnell Douglas (M-D) in her wrongful death action concerning an M-D aircraft. Following summary judgment for M-D based on the government contractor defense, an appeal to this court, and remand for clarification of the summary judgment order, the district court amended that order to include Bailey's manufacturing defect claim, as well as her design defect claim. We REVERSE as to the former.

I.

Air Force Major John M. Bailey was killed in 1987 when his aircraft, an F-4D "Phantom II" twin-engine jet fighter manufactured by M-D[2], crashed during a "pitch-out" landing approach to Carswell Air Force Base, near Fort Worth.[3]

---

[1]Senior District Judge of the Western District of Louisiana, sitting by designation.

[2]The aircraft had been delivered in 1967.

[3]The pitch-out is a standard maneuver, in which the pilot overflies a portion of the runway then breaks away, executing a tight, high-speed, steeply banked 360-degree turn back toward the runway, with the aircraft descending at a relatively rapid rate. The maneuver proceeded smoothly at first, but when the aircraft should have leveled out, it remained in a steep bank, its nose

In February 1988, Penny Bailey, Major Bailey's wife, sued M-D under Texas law for wrongful death, claiming strict liability for, and negligence in, the design, manufacture, and sale of a defective product, and the failure to warn of dangers associated with that product. Throughout the litigation, it was undisputed that the crash was caused, at least in part, by a failure in the bellows assembly in the aircraft's longitudinal feel trim system, which relates to control of the aircraft's "pitch", or nose up/nose down movement.[4] Bailey's theory of liability was that a defect in the metallurgic content of the bellows canister caused a loss of bellows pressure during the flight; that Major Bailey's response to the resulting "heavy stick" sensation was to "over control" the aircraft with a number of rapid movements on the control stick; and that the rapid stick inputs caused the controls to "lock" with the plane in a nose-down position. The alleged tendency of the controls to lock formed the basis of the design defect claim, and the alleged metallurgic defect in the bellows canister formed the basis of the manufacturing defect claim. M-D denied that the controls had locked, and asserted that the bellows failure was caused by careless maintenance of the system by Air Force personnel, not by any product defect.

In November 1989, after extensive discovery, M-D moved for summary judgment, contending that the basis of Bailey's theory of liability had eroded when the two Air Force investigators who had studied the remains of the flight control system recanted their "imprecise" use of the term "lock" in their report to describe what happened to the controls. Bailey contested this, and also presented the affidavit of her expert, Dr. Paul Packman, who articulated the theory of manufacturing defect, based upon his observation of an unusual crack in the remains of the bellows canister. Although, as noted, the complaint contained a manufacturing defect claim, this was the first time that the manufacturing defect theory was articulated.

---

continuing to drop as it rapidly lost altitude, and ultimately crashed.

[4]Because of the size and weight of the F-4D, a pilot cannot adequately control it by manual means. Therefore, it is controlled by hydraulic power, which removes the pilot's sense of feel as he grasps the control stick. The feel trim system is designed to simulate the forces a pilot would feel if he were controlling the plane manually. It is operated by a bellows system that uses air pressure differentials to transmit the artificial "feel" to the pilot's hand. It is undisputed that the accident was caused, at least in part, by a loss of bellows pressure in the longitudinal section of the feel trim system.

M-D moved to strike Dr. Packman's affidavit, contending that it untimely introduced a new theory of liability. While that motion was pending, Dr. Packman retreated from his position, at least somewhat, when the results of a metallurgic examination of the bellows components conflicted with his theory.[5] Ultimately, in August 1990, the district court denied M-D's motion to strike the affidavit, and also denied summary judgment, citing a genuine issue of material fact.

Shortly before those rulings, M-D filed a second motion for summary judgment (which eventually gave rise to this appeal), relying on the government contractor defense. In its supporting memorandum, it discussed only the control system's alleged tendency to lock, although, as noted, the metallurgic defect theory had already surfaced. Likewise, despite M-D's prayer that all claims be dismissed with prejudice, Bailey made no mention of the metallurgic defect theory in opposing the motion. In response, Bailey did, however, incorporate, *inter alia,* the discovery materials and affidavits in the record. In January 1991, the district court granted the motion and dismissed the case.

Bailey appealed, conceding that her design defect claim was properly dismissed, but contending that her manufacturing defect claim was not.[6] In late 1991, our court affirmed summary judgment on the government contractor defense and the design defect claim, but vacated and remanded for further consideration of the manufacturing defect issue, stating that it was unclear whether the district court had intended to dismiss that claim. *Bailey v. McDonnell Douglas Corp.,* 947 F.2d 1486 (5th Cir. Oct. 21, 1991) (unpublished).

In January 1992, the district court heard oral argument, then amended its prior order to include that claim in the summary judgment. This appeal springs from that order.

## II.

The government contractor defense, as formulated in 1988 by the Supreme Court in *Boyle,*

---

[5]The parties dispute the extent to which Dr. Packman abandoned his theory. Although he admitted that there was no evidence of a metallurgic defect in the area of the suspicious crack, he retained some suspicion about the cause of the bellows leak and wanted to "finish off that last five percent" of his investigation. It is unclear whether he still suspected some type of manufacturing defect. At oral argument in our court, Bailey reiterated that her manufacturing defect claim was based on the theory of metallurgic defect in the canister.

[6]Bailey has not challenged the disposition of her failure to warn claim.

generally immunizes government contractors from civil liability arising out of the performance of federal procurement contracts. 487 U.S. at 505-06, 108 S.Ct. at 2515. It is a federal common law doctrine whereby state law is preempted in certain situations because it presents a "significant conflict" with identifiable federal interests. *Id.* at 507, 108 S.Ct. at 2516. Specifically, it is designed to protect the exercise of discretion by government officers in "the selection of the appropriate design for military equipment to be used by our Armed Forces". *Id.* at 511, 108 S.Ct. at 2518.

The defense stems from the immunity enjoyed by the United States from claims based on the performance of so-called "discretionary functions", pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a).[7] *Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518. The rationale behind the defense is that, in its absence, the financial burden of liability judgments against government contractors ultimately would be passed through to the United States. *Id.* at 511-12, 108 S.Ct. at 2518. As noted in *Boyle:* "It makes little sense to insulate the Government against financial liability for the [discretionary decision] that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 512, 108 S.Ct. at 2518.

In order to effectuate this objective, *Boyle* provides that "[l]iability for *design defects* in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved *reasonably precise* specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States". *Id.* (emphasis added). "The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function' would be frustrated—*i.e.,* they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* "The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but

---

[7]Section 2680(a) creates an exception to the consent to suit otherwise established by the FTCA, 28 U.S.C. § 1346(b).

withholding it would produce no liability." *Id.*

Of *Boyle's* three conditions, in issue is the second—conformity with government specifications. As noted, the district court previously held, and our court affirmed, that M-D was entitled to invoke the defense with respect to Bailey's design defect claim, which was based on the control system's alleged tendency to lock. This holding included a finding that the feel trim system, including any tendency to lock, conformed to the government's specifications (*Boyle's* second condition). On remand, M-D contended that this finding of conformity on the design defect claim compelled a like ruling on the manufacturing defect claim. Bailey countered by contending first, that the Packman affidavit established a material fact issue as to a manufacturing defect[8]; and second, that, in any event, because the government contractor defense applies only to design defect claims, the summary judgment motion did not implicate the manufacturing defect claim.

In ruling, the district court stated that Bailey "fail[ed] ... to articulate the precise nature of the manufacturing defect", and that her only "theory of the case [was] that a defect in the design of the feel trim system ... caused the ... lock and that this occurrence" caused the crash. It then agreed with M-D, and reasoned that its prior finding that "the aircraft conformed to those specifications" necessarily precluded the existence of a manufacturing defect. It concluded:

> Because the Court previously determined, and the Court of Appeals affirmed, that no fact questions exist concerning whether the plane conformed to the Government's design specifications, the Court is of the opinion that the manufacturing defect question has been resolved. As stated by the Eleventh Circuit Court of Appeals:
>
> To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured.
>
> *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.198[9] ) [, *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990) ].

In relying on the statement from *Harduvel* (quoted by our court in *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 247 (5th Cir.1990)), the district court apparently assumed that the converse must also be true—*i.e.,* that a claim of manufacturing defect is equivalent to an allegation that the equipment failed to conform to specifications. In the district court's apparent estimation, therefore,

---

[8]Bailey also made reference to other possible manufacturing defects that Dr. Packman might address. Obviously, the district court could consider only material in the record.

the question of conformity with specifications could never be divorced from the question of manufacturing defect.

Thus, the district court did not apply the defense to Bailey's manufacturing defect claim. In fact, as noted, the theory supporting it was not really argued. After stating that there was a genuine issue of material fact on the manufacturing defect, Bailey contended that the motion did not apply to that defect. The district court simply used the finding of conformity—made while considering only the design defect theory—to preclude the existence of any manufacturing defect. We address that ruling first.

After reviewing that ruling, we face two other related—and principal—issues: (1) whether Bailey's labeling her claim as one for a manufacturing defect precludes, *per se,* application of the government contractor defense; and (2) if not, and in light of the fact that the district court did not rule on whether there was a material fact issue regarding the manufacturing defect claim, whether summary judgment was nonetheless appropriate because Bailey failed to properly present her manufacturing defect theory in opposition to the motion. As always, we review an award of summary judgment *de novo,* using the same standards as are applied by a district court. *E.g., Solomon v. Walgreen Co.,* 975 F.2d 1086, 1089 (5th Cir.1992).

### A.

As stated, before reaching the two principal issues, we address the district court's broad ruling that a manufacturing defect claim is equivalent to asserting that the item failed to conform to specifications. We hold that, for two reasons, it erred.

First, it is possible to have an allegedly defective feature about which the government specifications are silent. For example, if the government specifications regarding the bellows canister did not specify the type or quality of metal to be used, a metallurgic defect in the canister would not be inconsistent with a finding that the canister conformed to specifications.[9]

---

[9]We note that if a court were applying the defense to a claim based upon such a feature (which the district court did not do), *Boyle's* first condition—reasonably precise specifications—would probably be in issue with respect to that feature. *E.g., Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1486 (5th Cir.) (first condition lacking where government specifications set only general performance standards for a submarine hangar diving chamber, and were "silent" on

Second, *Boyle* makes clear that the requirements of "reasonably precise specifications" and conformity with them refer to the *particular feature* of the product claimed to be defective. 487 U.S. at 512, 108 S.Ct. at 2518 (the first two conditions address "the design *feature* in question") (emphasis added); *see also Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1486 (5th Cir.1989) (*Boyle* protects government contractors from liability only where "discretion over the design *feature* in question was exercised by the government") (emphasis added).[10] Here, there were two allegedly defective features—the control system's tendency to lock and the bellows canister's metallurgic content. M-D's evidence in support of its motion established only that the first feature conformed to government specifications. No evidence was introduced to support a finding that the canister's metallurgic content conformed with government specifications. The scope of the district court's finding, therefore, is limited to the particular feature in issue when it was made, notwithstanding its broad wording to the contrary.[11]

### B.

We next consider whether the manufacturing defect label precludes, *per se,* application of the defense; and, if not, and even though the district court did not determine whether there was an issue of material fact, whether summary judgment was nonetheless appropriate because Bailey failed

---

precise location of allegedly defective vent valve and safety devices), *cert. denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989).

In *Boyle,* the Court explained this situation as one in which "the [state law] duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed". 487 U.S. at 509, 108 S.Ct. at 2517. "If, for example, the United States contracts for ... an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing ... a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary". *Id.* In that case, "[t]he contractor could comply with both.... No one suggests that state law would generally be pre-empted in this context". *Id.*

[10] This principle clarifies the statement: "[t]o say that a product fails to conform to specifications is just another way of saying that it was defectively manufactured". *Mitchell,* 913 F.2d at 247. Obviously, not all deviations from specifications will constitute defective (*i.e.,* unreasonably dangerous) conditions. This statement logically refers, therefore, only to the *particular* deviation that is alleged to be defective.

[11] Naturally, had both features been better presented to the district court before the motion was decided, this problem would not have arisen.

to present adequate evidentiary support for her theory of manufacturing defect in opposition to M-D's motion.[12]  Asserting here, as she did to the district court on remand, that, as a matter of law, the defense can apply only to "design defect" claims, Bailey maintains that she had no burden to present her manufacturing defect theory in opposition to M-D's motion, in spite of M-D's prayer that all claims be dismissed.  Initially, we note that, although *Boyle* involved only a design defect claim, the Court did not indicate whether the defense was limited to that situation.[13]

1.

We first must determine whether the "manufacturing defect" label on Bailey's claim precludes, *per se,* application of the government contractor defense to it.  On first glance, our court's decisions regarding the scope of the defense may seem inconsistent.  In *McGonigal v. Gearhart Industries, Inc.,* 851 F.2d 774 (5th Cir.1988), we stated:  "it remains the law of this Circuit [after *Boyle* ] that military contractor immunity does not apply in cases of defective manufacture:  "federal law provides no defense to the military contractor that mismanufactures military equipment' ".  *Id.* at 777 (quoting *Bynum v. FMC Corp.,* 770 F.2d 556, 573 n. 21 & 574 (5th Cir.1985)).  In *Trevino,* 865 F.2d at 1481 n. 6, we reiterated:  "[a] manufacturer is liable for manufacturing defects no matter who designed or approved the specifications".  Likewise, in *Mitchell,* 913 F.2d at 246-47 & n. 9, we rejected an argument that the defense applied to a manufacturing defect resulting from the government's *design* of the manufacturing process, stating that this would "extend the defense unnecessarily".  Furthermore, in *Skyline Air Service, Inc., v. G. L. Capps Co.,* 916 F.2d 977, 980 (5th Cir.1990), we stated that manufacturing defect claims are "*arguably* not covered by the [defense]".  (Emphasis added.)

In contrast to these statements, however, we stated in *Smith v. Xerox Corp.,* 866 F.2d 135,

---

[12]As she did in district court at the remand hearing, Bailey contends that Dr. Packman's affidavit did present a genuine issue of material fact, even after his subsequent retreat.  For the reasons discussed *infra,* we need not reach this issue and instead assume, without deciding, that the affidavit did not create a genuine issue of material fact.

[13]For the reasons explained *infra,* we interpret *Boyle's* statement that the defense bars "[l]iability for *design defects* ", 487 U.S. at 512, 108 S.Ct. at 2518 (emphasis added), to mean liability for *defects in the government specifications.*

137 (5th Cir.1989), handed down by a different panel on the same day as *Trevino,* that "*Boyle* ... held that the government contractor defense applies to both negligence and strict liability actions, as well as to other state law tort claims". We then affirmed a summary judgment based on the defense that dismissed all claims, including manufacturing defect, design defect, failure to warn, and breach of warranty. *Id.* at 141.

After carefully reviewing these and other cases, we conclude that the seeming inconsistencies stem from uses of the term "manufacturing defect", instead of *nonconformity with government specifications,* and the term "design defect", instead of *a defect in the government specifications.*[14] Although usually there will be no significant difference between these terms and the intended meanings, that will not always be the case. As explained above, a manufacturing defect is not necessarily equivalent to nonconformity with government specifications, because those specifications may be silent about some features, making possible the existence of a manufacturing defect in spite of conformity with the specifications. Likewise, such silence in the specifications may leave room for design discretion by the manufacturer, making possible the existence of a design defect in spite of conformity with the government specifications.[15]

Furthermore, the denomination of a claim as one of "manufacturing defect" or "design defect" is a matter of state law, which varies by state. In *Harduvel,* for example, the Eleventh Circuit was faced with a presumption under Florida law that "where a product is destroyed in an accident, and the plaintiff presents evidence to negate possible causes other than a product defect, an inference of *manufacturing* defect arises". 878 F.2d at 1317. Thus, although the alleged defect was one inherent in the government specifications, the plaintiff's recovery was for *manufacturing* defect because the aircraft was almost completely destroyed.

Because of such peculiarities in state law, the *Harduvel* court held that the state law

[14]Throughout this opinion, we use the term "government specifications" rather than "government designs" to avoid further confusion over terminology.

[15]Again, we note that where the government specifications are silent with respect to the particular feature in issue, *Boyle's* first condition—government approved *reasonably precise* specifications—would probably be in issue if the defense were applied to that feature.

denomination of a claim as one of "design" or "manufacturing" defect could not govern the applicability of the government contractor defense. *Id.* It explained: "[w]ere this not so, state law could operate either to defeat the defense or to expand it improperly, and the defense could not be applied with the uniformity that is a key justification for application of federal common law". *Id.* It concluded that, despite its state law label, the claim was for a *design* defect for purposes of federal law, precluding recovery.

We agree with the Eleventh Circuit that whether the defense will apply cannot be determined by the label attached to the claim. Strict adherence to the three *Boyle* conditions specifically tailored for the purpose will ensure that the defense is limited to appropriate claims. In evaluating an assertion of the defense, therefore, the state law label on the claim(s) sought to be dismissed is irrelevant.

Upon closer analysis, our prior decisions are consistent with this principle. In *McGonigal,* for example, despite the above-quoted statement and the fact that the only theory presented was negligent manufacture, we proceeded to determine that the government contractor defense did not apply *because Boyle's second condition was not met.* 851 F.2d at 777. Likewise, in *Mitchell,* despite our rejection of the above-mentioned argument, we held that the defense did not apply because the jury found that the defective mortar shell *failed to conform to the government specifications.* 913 F.2d at 248. Additionally, when read in context, it is clear that our use of the term "manufacturing defect" in the above-quoted statement from *Trevino* refers simply to a failure to meet *Boyle's* second condition. 865 F.2d at 1481 n. 6 ("the second element functions [in part] to remove the government contractor defense for manufacturing defects"). Finally, in *Smith,* we stated that summary judgment on the manufacturing defect claim was proper, based on *Boyle's* second prong. 866 F.2d at 139.

In sum, the government contractor defense does not necessarily apply only to claims labeled "design defect". Whether it will apply to a particular claim depends *only* upon whether *Boyle's* three conditions are met with respect to the *particular product feature* upon which the claim is based.[16] As stated by the Supreme Court, those conditions are designed to assure that the defense will apply

---

[16]This means, of course, that in cases involving allegations of multiple defective features, summary judgment may not be appropriate if the defense applies to only *some* of those features, unless it is clear which features relate to which claims.

only where the discretionary function policy behind it would be frustrated. Bailey's contention that M-D's motion *necessarily* related only to her design defect claim, therefore, lacks merit.

2.

Having determined that M-D's motion based on the defense was not necessarily limited to Bailey's design defect claim, we must determine whether M-D established entitlement to summary judgment with respect to the manufacturing defect claim. As noted, in its order on remand, the district court stated that Bailey "fail[ed] to articulate the precise nature of the manufacturing defect." But, as also noted, Bailey, at the post-remand hearing, referenced the Packman affidavit on file and reiterated Dr. Packman's desire to further investigate the possibility of a manufacturing defect.[17]

Because the government contractor defense is an affirmative one, M-D bore the burden of proof to establish it. "Where ... the *moving party* [will bear] the burden of proof at trial, it must come forward with evidence [on summary judgment] which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir.1991) (internal quotation omitted), *cert. denied,* --- U.S. ----, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). In this situation, only *after* the moving party meets this burden must the non-moving party produce its "significant, probative evidence". *Id.* at 1265 (citing *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991)).

Because M-D did not present evidence that the three *Boyle* conditions were satisfied with respect to the metallurgic content of the bellows canister, upon which Bailey's manufacturing defect claim was based, it did not meet its burden of proof with respect to that claim; and, therefore, the burden did not shift to Bailey to present evidence to support her claim. In so holding, we emphasize that the metallurgic defect theory had arisen before M-D moved for summary judgment; it is not being held to the impossible burden of negating the possibility of yet unarticulated theories of defect.[18]

---

[17]Additionally, the day before the hearing, Bailey submitted an affidavit by Dr. Packman to that effect. She agrees that because it was untimely, this affidavit should not have been considered in the district court.

[18]As noted, for the first summary judgment motion, the district court denied M-D's motion to strike Dr. Packman's affidavit, which articulated the theory.

III.

For the foregoing reasons, the summary judgment as to the manufacturing defect claim is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

REVERSED and REMANDED.