**Katie M. BRAGG, Individually, Richard Lamar Bragg, Candice Bragg Walters and Katie M. Bragg, Administratrix of the Estate of Richard J. Bragg, Plaintiffs,**

v.

**UNITED STATES of America and Kirk Voich Gist, Inc., Defendants.**

No. Civ.A. 496CV138LN.

United States District Court,
S.D. Mississippi,
Eastern Division.

April 2, 1999.

Charles W. Wright, Jr., Palmer, Wright & Williamson, Meridian, MS, for plaintiff.

David N. Usry, U.S. Attorney's Office, Jackson, MS, Thomas W. Tyner, Aultman, Tyner, Ruffin & Yarborough, Ltd., Hattiesburg, MS, John L. Low, IV, Watkins & Eager, Jackson, MS, John Richard Barry, Lee Thaggard, Bourdeaux & Jones, Meridian, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

Defendants United States of America and Kirk Voich Gist, Inc. have separately moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Katie M. Bragg, Richard Lamar Bragg and Candice Bragg Walters have responded in opposition to the motions and the court, having considered the parties' memoranda of authorities, together with attachments, concludes, for reasons which follow, that the United States' motion is due to be granted, but that Kirk Voich Gist's motion, except as it relates to plaintiffs' strict products liability claim, should be denied.

*Plaintiffs' Complaint:*

On December 28, 1994, while working for his employer, UNC Aviation Services, at an aircraft painting facility located at the Naval Air Station in Meridian, Mississippi, Richard Bragg was killed when one of the swinging hangar doors closed on him, crushing him between the door and door jamb. Mr. Bragg's widow, Katie M. Bragg, individually and as administratrix of his estate, along with his children, Richard Lamar Bragg and Candice Bragg Walters, filed this wrongful death suit against the United States of America, which had contracted for the design and construction of the hangar facility in question and which owned the facility, and against Kirk Voich Gist, Inc., the architect/engineering firm which designed the facility in question,

including the hangar door which killed their decedent. Plaintiffs' claims against the United States, for negligence in the design of the hangar door and failure to maintain the premises in a reasonably safe condition by failing to warn of the dangers posed by the hangar door, are asserted under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), 2671–80; their causes of action against Kirk Voich Gist, Inc., (KVG), are based on theories of negligence and strict liability relating to the allegedly defective design of the hangar door.

*The Facts:*

The Meridian Naval Air Station (NAS) is a training facility for Navy pilots, which is owned and controlled by the United States Government. The "corrosion control facility" (or CCF) where Mr. Bragg was killed is among the maintenance buildings at the Meridian NAS, and was used for "touch-up" painting of military aircraft, particularly the T–45 jets flown by the pilots at the Meridian NAS.

The CCF, as designed by KVG pursuant to its contract with the Department of the Navy, is a three-bay hangar. The jet entrance to each bay is controlled by a massive, electrically powered air-plenum door that is five-feet thick, approximately twenty feet tall and forty-five feet wide, and weighs several tons.[1] The doors swing to open and close, moving slowly, at a rate of only about fifteen to twenty feet per minute, or three to four inches per second. At the time of the accident which resulted in Mr. Bragg's death, the doors to the hangar were operated with spring-loaded joystick controls which were mounted on the door. A set of controls was mounted on the interior and exterior faces of the door, inches from the leading edge of the door and about four feet above the ground. Each door could be closed only with the interior joystick and opened only with the exterior joystick and, the doors were designed with the spring-load feature so that the door would stop immediately once the joystick was released. Whenever the door was engaged, a rotating beacon and klaxon horn were activated and continuously annunciated while the door was in motion.

In March 1994, following construction of the CCF by Whitsell–Green, Inc.,[2] the Navy accepted the facility, and UNC, a civilian company that the Navy had contracted to perform corrosion control maintenance on its aircraft, immediately began work at the facility. Mr. Bragg had been employed by UNC since 1990 and worked at the CCF up until the time of his death on December 28, 1994. On that date, Bragg's body was found by a co-worker around 2:30 p.m. with his head and left shoulder inside the hangar bay, his neck resting on the interior joystick and holding it in a "close" position.

Though there were no witnesses to the accident, plaintiffs theorize that Mr. Bragg had opened the door slightly, just enough to squeeze though and, while attempting to pass through the opening between the door and the door jamb, tripped and fell, landing on the joystick control and activating the door. They believe the door closed on him before he was able to push himself off of the joystick control.

*THE UNITED STATES' MOTION:*

*The Discretionary Function Exception*

Plaintiffs' principal claim against the United States is that the hangar door of the CCF was negligently designed because

---

1. A file memorandum prepared by Ric Grimland, KVG's project manager, explains that the Navy requires laminar airflow during painting operations of 100 feet-per-minute across the aircraft in the direction air flows while the aircraft is in flight. Thus, the doors are designed with the air plenum feature, by which "[r]oof mounted air handlers blow conditioned air down into the open tops of the five-feet thick hollow doors and that air is uniformly discharged through the interior face of the doors through two sets of adjustable metal plates and a set of filters."

2. Whitsell–Green was originally named as a defendant but has since been dismissed pursuant to an agreement with the plaintiffs.

it had joystick controls rather than push-button controls, and because the controls were located near the leading edge of the door rather than a "safe distance" from the pinch point created where the door edge and door jamb met. They also charge that the Navy's failure to warn of the dangers of the hangar doors constituted a breach of its duty to maintain its premises in a reasonably safe condition. In its motion, the United States argues that this court lacks subject matter jurisdiction because the design and maintenance of the CCF was a discretionary function of the Navy and therefore, claims pertaining to the design and maintenance of the CCF are barred pursuant to the discretionary function exception of the Federal Tort Claims Act.

■ The United States, as sovereign, "is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998) (quoting *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980)). Thus, the doctrine of sovereign immunity bars suit against the Government unless there has been a clear and unequivocal waiver by the Government of its sovereign immunity. *Boehms v. Crowell*, 139 F.3d 452, 462 (5th Cir.1998).

The FTCA represents such a clear and unequivocal waiver of the United States' sovereign immunity with respect to suits against the government based on alleged negligent acts and omissions of its employees;[3] that waiver is limited, however, and does not extend to any claim against the government which is "[b]ased on the exercise or performance or the failure to perform a discretionary function or duty on the part of the federal agency or employee of the Government, whether or not the

discretion involved be abused." 28 U.S.C. § 2680(a).[4] This exception, known as the "discretionary function exception," is said to "mark[ ] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–62, 81 L.Ed.2d 660 (1984). *See also Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988) (exception represents Congress's desire to prevent "judicial 'second-guessing' of legislative and administrative decisions ground in social, economic, and political policy through the medium of an action in tort.").

In *Baldassaro v. United States*, 64 F.3d 206 (5th Cir.1995), the Fifth Circuit, summarizing the contours of the exception as recast by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), stated that in order for the exception to apply, two requirements must be satisfied: The challenged act must have involved an element of judgment or choice, and it must be based on considerations of public policy. *Baldassaro*, 64 F.3d at 208. The court explained:

> The exception covers only acts that "involv[e] an element of judgment or choice;" thus, " 'it is the nature of the conduct, rather than the status of the actor,' that governs whether the exception applies." As the purpose of the exception is to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort,' " it " 'pro-

3. The Federal Tort Claims Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

4. There are other exceptions to the waiver, none of which is relevant in this case.

tects only governmental actions and decisions based on considerations of public policy.' "

*Id.* (quoting *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1273).

Regarding the element of "discretion," the Court in *Gaubert* held that the exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for the Government to follow, for in that circumstance, there is no "element of choice" as the Government "has no rightful option but to adhere to the directive." *United States v. Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273 (1991) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)). If, on the other hand, the controlling statutes, regulations and administrative policies do not mandate a particular course of action, then the government's decisions on such matters involve an exercise of discretion. *Baldassaro,* 64 F.3d at 208. As to the "public policy" aspect of the exception, the Court held, and *Baldassaro* reiterated, that "when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274 (quoted in *Baldassaro,* 64 F.3d at 208).

> [I]n light of this presumption, to survive a motion to dismiss based on the discretionary function exception a complaint "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." . . . [I]n determining whether the discretionary function exception bars a suit against the government, the focus of the inquiry is on the nature of the action taken and on whether that action is susceptible to policy analysis.

*Baldassaro,* 64 F.3d at 208 (citing *Gaubert* ).

While the elements of the discretionary function exception derive from *Gaubert,* in the court's opinion, the Fifth Circuit's explication in *Baldassaro* of the *Gaubert* elements not only informs, but prescribes this court's analysis of the Government's motion in the case at bar, as well as the outcome of the motion in *Baldassaro,* a seaman who was injured while working aboard a vessel that was part of the National Defense Ready Reserve Fleet (RRF) sued for injuries that he sustained when part of the detachable sea rail separated from his bunk while he was climbing into his upper bunk, causing him to fall. He sued his employer, the Government, under the Suits in Admiralty Act, 50 U.S.C. App. § 1291 (1981), alleging negligence in failing to secure the railing. The lower court dismissed his claim based on the discretionary function exception, and the Fifth Circuit affirmed.[5]

Looking first at the "nature of the decision" to determine whether it was discretionary, the court concluded that because the act of selecting or approving a particular ship for the Fleet involved an element of discretion or choice by the Secretary of Transportation, who was charged by statute with the duty of deciding which ships to place and maintain in the fleet, then "that act, standing alone, satisfie[d] the first prong of the discretionary function standard." *Id.* at 209. "Taking [its] analysis a step further and focusing on the act of equipping the bunks on the [ship] with detachable sea rails," the court noted that as there were "no statutes, regulations, policies, guidelines, or Maritime Administration (MARAD) standards that re-

---

5. Although the suit in *Baldassaro* was brought not under the FTCA but under the Suits in Admiralty Act (SAA), which does not contain an express discretionary function exception to its waiver of sovereign immunity, the court "recognize[d] that the FTCA's exception is 'implicit in private suits brought against the United States Government under the Suits in Admiralty Act.' " *Baldassaro,* 64 F.3d at 208 (citation omitted).

quire[d] sea rails to be attached permanently to the bunks on RRF vessels," it "follow[ed] that the decisions regarding the design of the [ship's] bunks and sea rails were within the discretion of the United States." *Id.* at 209. The court observed that while further analysis of the "discretion" prong of its inquiry was "unnecessary in light of the absence of a statutory mandate requiring permanently attached sea rails," *id.* at 209, it was nevertheless convinced from its review of the history of the ship in question that the design of the bunks was a discretionary act. This was so, the court said, because the design standards applicable to the ship actually gave the shipbuilder the option of using either detachable or permanent sea rails. Since "the decision to equip the vessel with detachable sea rails was optional," the court said, "it follow[ed] that the decision was in fact a discretionary one." *Id.* at 210.

■ In accordance with *Gaubert,* the first question which must be asked in response to the Government's motion is whether the Navy's decision to use joystick controls on the hangar door of the CCF, and to locate the controls on the edge of the door, was "discretionary." In accordance with *Baldassaro,* the answer to that question is unequivocally "yes." There is no question but that "[e]stablished governmental policy, as express or implied by statute [and] regulations" imbued the government with discretion to construct, or contract for the construction of, the CCF at the Meridian NAS, and plaintiffs do not contend otherwise. By statute, the Secretary of the Navy is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Navy, including "the construction, maintenance, and repair of buildings, structures, and utilities and the acquisition of real property and interests in real property necessary to carry out" the Navy's responsibilities. 10 U.S.C. § 5013(b). *See also* 32 C.F.R. § 700.102 (fundamental objectives of the Department of the Navy are to "organize,

train, equip, prepare, and maintain the readiness of the Navy ..., and [t]o support Navy ... forces....)"; 32 C.F.R. § 700.304(b)(1) & (2) (Chief of Naval Operations has the specific responsibility to "organize, train, equip, prepare, and maintain the readiness of Navy forces," and to "determine and direct the efforts necessary to fulfill current and future requirements of the Navy .... for manpower, material, weapons, facilities, and services...."). Consequently, the decision to construct the CCF at the Meridian NAS satisfies the first prong of the discretionary function exception standard. *Baldassaro,* 64 F.3d at 209.

"Taking [the] analysis a step further and focusing on the act of equipping the [hangar door] with [joystick controls]," the court concludes that, notwithstanding plaintiffs' contrary insistence, there are no statutes, regulations, policies, guidelines, or standards that dictated the use of a particular type of door controls, and "it follows," therefore, that the decision to use joystick controls for the operation of the hangar door was within the Government's discretion. *Baldassaro,* 64 F.3d at 209.

Plaintiffs submit that the Navy lacked discretion to use joystick controls for the hangar doors inasmuch as the Navy's own design standards for these doors, as set forth in Military Handbook 1028/1, mandated the use of pushbutton controls. They contend, therefore, that the discretionary function exception does not operate to immunize the Government from liability for its violation of its own design criterion. Defendants, though, maintain that neither Military Handbook 1028/1, nor any other applicable governmental guideline or regulation, required the use of pushbutton controls for the CCF hangar doors. They thus conclude that the design and use of joystick controls violated no statute, directive, policy or regulation.

It is undisputed that Military Handbook 1028/1 was included in the design kit which the Navy furnished to KVG for use in designing the CCF, and that the design

criteria established by the Handbook applied to the CCF project.[6] The parties disagree, however, as to what those criteria were. For their part, plaintiffs assert that "MIL/HDBK 1028/1 states [at Section 3.3] that pushbutton control devices *shall* be used to open and close Corrosion Control Facility hangar doors." However, that is not what the Handbook states.

Military Handbook 1028/1, entitled "Aircraft Maintenance Facilities," sets forth the specifications for various types of facilities, including, *inter alia,* maintenance hangars, corrosion control hangars, paint-finishing hangars and engine-maintenance shops. Section 2 of the Handbook addresses maintenance hangars and provides detailed specifications for the roof, floors, walls and other components. With specific reference to maintenance hangar doors, Section 2.3.6.1 dictates the use of horizontal sliding leaves made of preformed (corrugated) metal or sheet-steel siding, either hand-crank-operated or electric-motor-operated, which are capable of movement at a minimum speed of 60 feet per minute. As for door controls, Section 2.3.6.1 states:

> Control of the doors shall be by momentary contact type pushbuttons located near the leading edge of the door and limit switches on each door leaf. Safety devices shall be installed to prevent injury to personnel and damage to equipment by moving door sections. An alarm will sound in conjunction with safety warning beacons when doors are in motion.

While Section 3 of the Handbook sets forth the design criteria specifically applicable to corrosion control hangars, language appearing in Section 3.3 incorporates for corrosion control facilities "the general architectural criteria of Section 2."[7] It is upon this language that plaintiffs base their argument that pushbutton controls are mandated for corrosion control hangar doors. They reason that because Section 3.3 adopts for corrosion control hangars the design criteria set forth in Section 2.2 for maintenance hangars, it follows that for hangar doors of corrosion control facilities, just as for hangar doors of maintenance hangars, control of the doors is required to be "by momentary contact type pushbuttons located near the leading edge of the door."

Defendants argue that the provisions of the Handbook cannot reasonably be read to dictate the use of pushbutton controls for corrosion control hangar doors. Challenging plaintiffs' proffered interpretation as "an exercise in linguistic gymnastics," they contend that the phrase "general architectural criteria" appearing in Section 3.3 plainly does not encompass the specific criteria in Section 2 relating to the design of maintenance hangar doors and door controls but rather refers only to the broader criteria for the walls, roof and other structural components.[8] They state that "[o]bviously, a true reading of the appropriate sections (of the Handbook) indicates that push-button control devices are required for maintenance hangars and not corrosion control hangars."

The court is of the opinion that when read as a whole, the more reasonable, if not only reasonable, interpretation of the subject Handbook provisions is that ad-

---

6. A different version of this handbook, Military Handbook 1028/1A, was included in the Government's initial core disclosures to plaintiffs. The Government later produced the earlier version of the handbook, Military Handbook 1028/1, explaining that Handbook 1028/1A had not been in effect at the time of the design work on the CCF project KVG's work and did not apply to the project and that its production of Handbook 1028/1A had been a mistake. The parties agree that Handbook 1028/1, and not 1028/1A, is applicable.

7. That Section states, "The general architectural criteria of Section 2, covering maintenance hangers, shall apply to the Corrosion Control Hangar."

8. Such a construction, they submit, is particularly unwarranted given the substantial differences in the two types of facilities, in general, and the doors of the facilities, in particular.

vanced by the Government. Even were that not so, the Government's interpretation is nevertheless (and at the very least) as plausible as plaintiffs'—which is to say that the provisions of the Handbook are at best ambiguous. And in the court's view, an ambiguous regulation which can reasonably be read to give the Government the option to follow one course or another does not deprive the Government of the prerogative to choose the course. There remains an "element of choice," *Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1277 (quoting *Berkovitz*), and hence discretion. *See Dube v. Pittsburgh Corning,* 870 F.2d 790, 793 n. 4 (1st Cir.1989), *abrogated on other grounds, Shansky v. United States,* 164 F.3d 688 (1999) (fact that regulation was at best ambiguous militated against its service as a vehicle for the imposition of government liability under *Berkovitz*); *cf. Linkous,* 142 F.3d at 275 ("Courts must strictly construe all waivers of the federal government's sovereign immunity, and must resolve all ambiguities in favor of the sovereign."); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 733, 115 S.Ct. 2407, 2430, 132 L.Ed.2d 597 (Scalia, J., dissenting) ("We defer to reasonable agency interpretations of ambiguous statutes precisely in order that agencies, rather than courts, may exercise policymaking discretion in the interstices of statutes."). In summary, therefore, the court concludes that the provisions of Military Handbook 1028/1 do not clearly dictate a particular course of action for the design of doors and door controls for corrosion control facilities.

Plaintiffs argue additionally and/or alternatively, that even if the Handbook did not mandate use of pushbutton controls, there are still other governmental regulations and standards which limited the Navy's decision-making prerogative, and in particular OSHA regulations. However, the only OSHA "requirement" claimed by plaintiffs to have been violated is the provision of Section 5(a)(1) of OSHA, 29 U.S.C. § 254, which imposes on every employer a duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees."[9] That section is too vague to constitute a "directive" that the Government act in a specific manner, i.e., that it choose one type of door control over another or that it locate the door controls in a specific place. Indeed, plaintiffs' own proof, in the form of the affidavit of the OSHA investigator, is to the effect that he resorted to the general duty clause of OSHA because "no 'industry standard' existed concerning this type of hangar facility." Plainly, a general

---

9. As support for their assertion that this OSHA provision was violated, plaintiffs have presented the affidavit of Steven "Mack" Ferguson, the OSHA investigator sent to investigate the circumstances surrounding Mr. Bragg's death. In his affidavit, Mr. Ferguson explains that he considered that the hangar door was not simply a door, but was more in the nature of a machine; and he was of the view that the use and location of the controls at the leading edge of the door violated basic machine design principles, as set forth in American National Standards Institute Guide (ANSI), of "guarding by safe distance." He thus recommended to his supervisor that the Government be cited and fined and/or sanctioned for violating Section 5(a)(1) of OSHA. Ferguson recites,

> We, OSHA, issued a letter ... citing Section 5(a)(1) of the OSHA Act, and advised the Naval Safety Department at NAS Merid-

ian that the joystick device had to be moved several feet from the edge of the door.... The letter ... was effective as the United States Navy complied....

While one could reasonably assume from reading Mr. Ferguson's affidavit that the Government was, in fact, cited for violating Section 5(a)(1), that is not the case. Though Mr. Ferguson may have recommended to his supervisor that the Navy be cited, the letter actually sent to the Navy by OSHA specifically recited that "[s]ince no OSHA standard applies, it is not considered appropriate [by OSHA] at this time to invoke 5(a)(1), the general duty clause of OSHA." In any event, for the purposes of evaluating the applicability of the discretionary function exception, it is ultimately inconsequential whether or not OSHA, or any of its employees, found a violation of Section 5(a)(1).

requirement that employers provide their employees a safe place to work cannot reasonably be found to direct specific conduct. *See Shansky v. United States,* 164 F.3d 688, 690 (1st Cir.1999) (general safety statute which did not specifically prescribe that any particular safety measure be employed at any particular place in any particular facility did not satisfy *Gaubert*'s and *Berkovitz*'s specific prescription requirement); *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1026–27 (9th Cir.1989) ("*Berkovitz* establishes that a safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors. A general statutory duty to promote safety would not be sufficient.").

Given "the absence of a statutory mandate requiring [either pushbutton controls or controls located a 'safe distance' from the CCF door]," *Baldassaro,* 64 F.3d at 209, further analysis of the "discretion" prong of the discretionary function exception inquiry is "unnecessary," *id.* The decision to use joystick controls on the leading edge of the door of the CCF hangar was optional, and hence, discretionary. *Id.* at 210. The question then becomes whether that decision is "susceptible to policy analysis." *Id.* at 209.

Plaintiffs argue that even if the Navy's decisions as to the hangar door and controls were discretionary, they were not policy driven. However, since the law presumes that the exercise of official discretion implicates policy judgments, plaintiffs can prevail on this argument only if they are able to show that the decision with respect to the door controls was not susceptible to policy analysis. *Baldassaro,* 64 F.3d at 211. This, they have not done.

The primary rationale which plaintiffs urge in support of their contention that the decision with respect to the type and placement of door controls on the hangar door of the CCF is not susceptible to policy analysis stems from an erroneous premise and ultimately, amounts to nothing more than a regurgitation of their assertion that the Navy lacked discretion in the first place to use joystick controls since Military Handbook 1028/1 mandated the use of pushbutton controls. That is, they argue that "the government fails to meet the second prong of this test which is policy analysis" because,

> [t]he government fails to show that it exercised any policy consideration in deviating from its own established accepted policy as set forth in its military handbook. Absent this type of showing, the government must fail in its attempt to hide behind the discretionary function defense.

Plaintiffs' reasoning on the "policy" prong fails for the same reason that their position on the "discretion" prong was rejected, namely, there was no specific directive or standard applicable to the design of the CCF hangar door controls. The Government cannot be called upon to explain the "policy considerations" for deviating from a governmental policy when there was no such policy from which to deviate.[10]

Plaintiffs argue alternatively that even if the Government may have had the option (or discretion) to choose another door control mechanism/system, since no analysis of policy considerations attended the decision with respect to the design of the door controls, the discretionary function exception is inapplicable. They urge, moreover, that even if the decision as to the use and location of joystick controls for the door was attended by the use of actual judgment on the part of the Government, since that judgment was exercised at the "operational level" and not at the "planning level," it is not the kind of "policy" decision that the discretionary function exception was intended to immunize.

---

**10.** It should be noted, too, that had there been a mandatory policy, there would have been no "discretion" and the court would not even reach the "policy prong" of the discretionary function exception analysis.

If it is plaintiffs' position that the policy prong is not satisfied because the Government made no actual analysis of (and in fact gave no consideration to) the design of the hangar door, i.e., that it did not even consider, much less analyze this particular aspect of KVG's design for the CCF, their position is once again based on an erroneous premise. Contrary to plaintiffs' apparent comprehension, the pertinent inquiry on the "policy analysis" prong of the discretionary function exception inquiry is not whether the discretionary act at issue involved actual policy analysis but whether the act was "susceptible to policy analysis." Put another way, so long as this particular feature of the overall design for the CCF was "susceptible to policy analysis," it matters not whether there was any policy analysis, or any analysis at all, of the decision to use this particular design. *Baldassaro,* 64 F.3d at 211. *See also Gotha v. United States,* 115 F.3d 176, 180 (3d Cir.1997) (whether policy discretion is implicated does not depend on proof that the Government actually considered and made a conscious decision regarding a particular issue, but on whether the action taken or not taken is "susceptible to policy analysis"); *Smith v. Johns–Manville Corp.,* 795 F.2d 301, 308–09 (3d Cir.1986) ("The test is not whether the government actually considered each possible alternative in the universe of options, but whether the con-

duct was of the type associated with the exercise of official discretion."). Accordingly, as it relates to the applicability of the discretionary function exception, the fact that the Navy may not actually have balanced the particular design of the CCF hangar door control against social, economic or political concerns is of no consequence.

Plaintiffs' further argument, that the Government has no immunity for the decision as to the design of the hangar door controls because the decision was an "operational level" and not a "planning level" decision, must be rejected by this court since the planning-/operational-level distinction recognized in numerous pre-*Gaubert* decisions as dispositive of the policy inquiry was rejected by the Supreme Court in *Gaubert. Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275 ("Discretionary conduct is not confined to the policy or planning level.").[11] In the wake of *Gaubert,* the characterization of a decision as "operational" is no longer pertinent to the policy inquiry.

Applying the *Gaubert* presumption that a government agent's actions are "grounded in policy when he exercises discretion" that is allowed, explicitly or implicitly, by government policy, the court in *Baldassaro* wrote that it was "satisfied that the

---

**11.** In support of their position on this point, plaintiffs cite numerous cases in which courts, including the Fifth Circuit, have held that while the Government has immunity for its decisions at the "planning level," such decisions being policy-based, decisions made in the implementation of the "plan" at the "operational level" are not policy decisions. They point out, for example, that in *Moyer v. Martin Marietta Corp.,* 481 F.2d 585 (5th Cir. 1973), in which the plaintiff alleged that the Government was negligent in the design of the ejection seat of a military jet, the court recognized that while the discretionary function exception would apply to the selection of military aircraft and number of aircraft purchased, it did not extend to immunize the government's acceptance of a system of the aircraft, namely, the design of the ejection seat. *Id.* at 598. *Moyer,* though, was overruled by the Fifth Circuit in *Baldassaro,* not

expressly because of its reliance on the planning-/operational-level distinction, but more generally because of "the jurisprudence that has evolved in the twenty-two years that have elapsed since that opinion was written." *Baldassaro,* 64 F.3d at 210. "The jurisprudence" to which the court referred in *Baldassaro,* includes *Gaubert* in particular, which disavowed this distinction as a basis for determining the applicability of the discretionary function exception. It is evident that this planning-/operational-level distinction appears to have largely fallen by the wayside in the wake of *Gaubert,* for therein the Court held that a " 'discretionary function' can ... include even a low-level operational decision so long as the decision 'requires judgment as to which of a range of permissible choices is the wisest.' " *Coumou v. United States,* 114 F.3d 64, 65 (5th Cir.1997) (quoting *Gaubert* ).

MARAD ship design decisions ..., including *inter alia* whether to install detachable sea rails ..., involve[d] the weighing of competing policy considerations that the discretionary function exception protects from judicial scrutiny." *Id.* at 211. On this subject, the court remarked:

> The decision to use detachable sea rails was but one of myriad details that added up to the total ship design eventually approved by MARAD as an exercise of its discretion in selecting vessels that it determined were of value for national defense. We venture that almost any exercise of governmental discretion could be overly parsed so as to focus on minute details of subdecisions to the point that any relationship to policy would appear too attenuated. But doing that obscures the very purpose of the discretionary function exception. Clearly, that purpose is to prevent judicial "second-guessing" of decisions arising from and grounded in policy. We are neither in a position—nor do we desire to be—to dissect and second guess each discreet aspect of a total design package that is grounded in policy considerations pertaining to national defense. Indeed such tunnel-visioned analyses would render the discretionary function exception nugatory and open virtually every decision that implements a governmental policy to liability under some waiver of sovereign immunity.

*Id.* at 211–12 (citations omitted). The court went on to say,

[T]he burden is on Baldassaro to allege facts that would support a finding that the challenged action is not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. Baldassaro conclusionally asserts that the government's decision regarding the design of the sea rails was not rooted in any social, economic, or political policies. What he has failed to do, however, is to present specific facts sufficient to rebut the presumption that the particular design decision was grounded in the same policy considerations that underlie the statute authorizing the United States to exercise its discretion in determining which vessels are of value for national defense.

*Id.* at 211.[12] In the court's opinion, the case at bar is, for present purposes, indistinguishable from *Baldassaro*. Here, as in *Baldassaro*, plaintiffs have failed to present "specific facts" to rebut the presumption that the challenged decision was policy-driven. The court is therefore compelled to conclude that the decision to use joystick controls located on the leading edge of the CCF hangar door is protected by the discretionary function exception.

■ In addition to their negligent design claim against the Government, plaintiffs have charged that the Navy breached its state law duty to maintain the CCF premises in a reasonably safe condition because it failed to warn of the dangers posed by the hangar doors. The Government contends that its decision to delegate to UNC, Mr. Bragg's employer, full and

12. In a number of cases preceding *Gaubert*—several of which are cited by the plaintiffs—the Fifth Circuit had advocated restraint in application of the discretionary function exception. For example, the following appears in a concurring opinion in *Collins v. United States*, 783 F.2d 1225, 1233 (5th Cir.1986) (Brown, J., concurring):

> Every act of a rational human being involves some element of choice—speed up or slow down, turn right of left, put helm port or starboard, go full astern or full ahead, tighten brakes or replace them, glide in or circle, use general anesthetic or local, use a

human heart or a Jarvice. It is plain that the discretionary function exception of § 2680(a) must be applied with restraint if the Tort Claims Act is to achieve the ... purposes which motivated its enactment. [Unless] § 2680(a) is read carefully, it will insulate the government from nearly all tort liability.

A reading of *Baldassaro* would seem to suggest that the court has moved away from, if not altogether abandoned, that earlier policy of restraint based on its recognition of the analytical changes wrought by *Gaubert*.

primary responsibility for worker safety, falls within the discretionary function exception so that it also has immunity for this claim. The Government's position is well taken.

In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court held that "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig*, 467 U.S. at 819, 104 S.Ct. at 2767. Indeed, a governmental decision to delegate to a contractor the primary duty for safety on the job, even when the government has retained authority to inspect the job site, constitutes a "discretionary function." *See, e.g., Cazales v. Lecon, Inc.*, 994 F.Supp. 765, 774 (S.D.Tex.1997) (VA assignment to contractor of primary duty for safety on the job, despite its retention of authority to inspect site, was discretionary act which came under aegis of discretionary function exception); *Berghoff v. United States*, 737 F.Supp. 199, 202 (S.D.N.Y. 1989) (delegation of safety responsibility to contractor found and discretionary function exception applied even though contract directed contractor to submit safety plan for approval by government official, and authorized government official to notify contractor of noncompliance with safety provisions and specify corrective actions, and to assess site to determine adequacy of safety measures); *cf. Duff v. United States*, 999 F.2d 1280 (8th Cir.1993) (exception applied to government's decision to delegate to its contractor responsibility for making safety judgments where government retained no day-to-day supervisory responsibility).

In response to the Government's motion on this point, plaintiffs assert that the Government's claim that it delegated responsibility for worker safety to UNC is "incorrect," and that "[n]owhere in the contract does it state specifically that the contractor, UNC, is delegated all duties of safety responsibilities, all duties of safety warning in Navy buildings, all duties of maintaining, all liability of injury, or indemnification of Navy." In support of their position, they state only that "[a] full reading of the contract under SAFETY AND HEALTH indicated C–15(1): Enumerations of requirement: contractor to follow Navy directives and technical publications including GSHA standards." However, in clear terms, the Government's contract with UNC required that UNC "establish and maintain a safety program for the prevention of accidents involving personnel, equipment, and property including flight and industrial safety considerations," and there is no evidence in the record to indicate that the Navy retained any responsibility for or exercised control over worker safety. The fact that the Navy may have directed that UNC follow Navy safety standards in the execution of UNC's contractual duty to provide for worker safety does not detract from the fact of the delegation, and the discretion inherent in that decision. *See Johns v. Pettibone Corp.*, 843 F.2d 464, 466–67 (11th Cir.1988) (discretionary function exception applied where government contractor agreed "to insure that [specifically identified government safety standards and OSHA standards] [were] being complied with at all times."). Accordingly, the court concludes that the discretionary function exception applies to plaintiffs' premises liability claims, as well as to their negligent design claims.

For the foregoing reasons, the court concludes that the discretionary function exception operates to keep intact the Government's sovereign immunity as to both of the plaintiffs' causes of action, and summary judgment will therefore be granted for the United states. *See Fullmer v. United States*, 34 F.Supp.2d 1325, 1329 n. 6 (D.Utah 1997) ("Only if the United States waives its sovereign immunity pursuant to the FTCA does the question of

whether the government owed the plaintiffs a duty of care under state law arise.").

*KVG's MOTION:*

*The Government Contractor Defense:*

KVG has moved for summary judgment, contending that it is protected from liability by the government contractor defense, as formulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). It argues that the design of the CCF door and door controls was dictated by the Navy, which had provided specific guidelines that called for joystick controls on the leading edge of the door. It submits further that even if its particular design, i.e., joystick controls on the edge of the door, was not specifically mandated by the Navy's guidelines, the government contractor defense nevertheless shields it from liability on plaintiffs' claim of design defect since KVG's design and specifications for the CCF project, which clearly identified the use and precise location of the joystick controls for the CCF hangar doors, were approved by the Navy only after numerous critical and searching reviews. It contends that the design of the hangar door controls was therefore an exercise of governmental discretion, for which KVG may not be found liable.

The "government contractor defense," upon which KVG relies, is an affirmative defense, as to which KVG bears the burden of proof. *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir.1993). The defense, established by the Supreme Court in *Boyle, supra,* stems from the United States' immunity for discretionary functions, *id.,* and in particular, the recognition that "[i]t makes little sense to insulate the Government against financial liability for the [discretionary decision] that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Boyle,* 487 U.S. at 511–12, 108 S.Ct. at 2518. Thus, "[t]he rationale behind the defense is that, in its

absence, the financial burden of liability judgments against government contractors ultimately would be passed through to the United States." *Bailey,* 989 F.2d at 798.

█ In order for the defense to apply, three requisites must be met:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* (quoting *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518).

"The first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated—i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." ... The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

*Id.*

In *Trevino v. General Dynamics Corp.,* 865 F.2d 1474 (5th Cir.1989), the Fifth Circuit examined the government contractor defense, as articulated in *Boyle,* and noted that what is ultimately determinative as to the applicability of the defense in a given case is whether the "design choice" at issue was the contractor's choice or the government's, for only in the latter case is the government's discretion implicated. *Id.* at 1480. If the Government delegated to the contractor the discretion to choose the design, without specific direction and/or without substantive review of the design, the discretion is the contractor's

and the defense does not apply. Moreover, the defense protects government contractors from liability for design defects only where "discretion over the *design feature in question* was exercised by the government." *Id.* at 1486 (emphasis added). *See also Bailey*, 989 F.2d at 799 ("[T]he requirements of 'reasonably precise specifications' and conformity with them refer to the particular feature of the product claimed to be defective.").

In the case at bar, KVG argues that the first two *Boyle* elements are plainly met since the Navy actually specified the use of joystick controls for the hangar doors and dictated the location of the controls.[13] In support of this assertion, KVG relies on the deposition testimony of its project manager, Ric Grimland, who explained that the design kit which the Navy provided to KVG included a copy of the "in-progress" specifications for a corrosion control facility that had been constructed in Kanohoe Bay, Hawaii. Those specifications, which Grimland claimed KVG was directed to follow, not only called for the use of joystick controls for the hangar doors, but also provided how the controls were to be configured, i.e., so that the operator would be required to walk in front of the hangar door as it moves, keeping a look-out for people or obstacles in the path of the door. KVG insists that in light of this Navy directive as to the design of the CCF in general, and the door and door controls in particular, it necessarily follows that the Navy, and not KVG, exercised the discretion over the design feature at issue.

■ Under *Boyle*, there is no question but that "the government exercises its discretion over the design when it actually chooses a design feature." *Trevino*, 865 F.2d at 1480. Plaintiffs, however, vigorously dispute that the Navy directed, or even so much as suggested, the use of joystick controls for the hangar door of the CCF at the Meridian NAS. They maintain that the Hawaii drawings were included in the design kit for information purposes only and not because KVG was directed or expected to copy the Hawaii design, or any particular aspect of that design, verbatim.[14] A review of the parties' submissions on this issue reveals an obvious factual dispute as to the Navy's initial criteria (or lack thereof) for the Meridian NAS CCF project with respect to the hangar door controls, and as to whether those criteria called for the use of joystick controls, as KVG claims, or whether they directed that KVG use another control mechanism or were merely silent on the subject.[15] However, it is not necessary to application of the defense that the government itself "set" the "reasonably precise specifications" or that such specifications originated with the government; the defense will apply, as well, if the government "approved" the contractor's reasonably precise specifications. *See Stout v. Borg–Warner Corp.*, 933 F.2d 331 (5th Cir.1991); *Trevino*, 865 F.2d at 1480.

13. There can be no serious argument that the third *Boyle* element is not satisfied, for there is no evidence that KVG was aware of any dangers from the use of joystick controls, and certainly no proof that KVG was aware of dangers that were not known to the Navy.

14. In support of their position in this regard, plaintiffs point to the deposition testimony of Effie Meletis, a Planning and Design Manager with Southern Division Naval Facilities Engineering Command, who was the Naval engineer in charge of overseeing the design of the CCF and who was the liaison contact for the Navy with KVG. She testified that the Hawaii "plans and specs were given to them (KVG) to use just for the benefit of, to assist them during the design. They were not told to use that verbatim. It was not submitted as a site adapt plan for the Hawaii project."

15. It will be recalled that plaintiffs have claimed not only that the Navy did not dictate the use of joystick controls for the CCF at the Meridian NAS but that, on the contrary, the Navy actually directed the use of pushbutton controls by virtue of its having included Military Handbook 1028/1 in the design kit provided to KVG.

In *Trevino*, the court undertook to answer the question, left unresolved by *Boyle*, of "what constitutes 'approval' under the first element of the *Boyle* defense." *Trevino*, 865 F.2d at 1478. The court explained that "[i]f the government has ... delegated its discretion [over the design feature in question] to the contractor, mere government acceptance of the contractor's work does not resuscitate the defense unless there is approval based on substantive review and evaluation of the contractor's design choices." *Id.* at 1486. Thus, the court held, a mere "bureaucratic rubber stamp[ ]," given "without any sort of review or evaluation of the designs" and which "signifie[s] at most the government's decision to allow the contractor to make all of the important design choices," does not constitute "approval" under the *Boyle* test. *Id.* at 1479.[16]

Because in *Trevino*, the Government had merely set "general performance standards," i.e., had not itself set reasonably precise specifications, and government officials had thereafter conducted no review of the contractor's design but had merely signed off on the design drawings indicating their approval, i.e., gave their "rubber stamp approval," the *Trevino* court had no need to elaborate on the extent of governmental review that would be required in order for the review to qualify as "substantive" and hence to constitute "approval." Subsequently, however, in *Stout v. Borg-*

*Warner Corp.*, 933 F.2d 331 (5th Cir.1991), the court confronted the "approval" issue where there had been governmental review of the contractor's design, and the question was whether the "government approved of reasonably precise design drawings or whether it only rubber-stamped its acceptance of such drawings." *Id.* at 336.

Addressing this issue, the court reiterated the distinction drawn in *Trevino* "between situations in which the government engages in a substantive review and evaluation of the relevant design features prepared by the contractor and other situations in which the government does not engage in a meaningful review of the design but merely accepts the contractor's design choice," *id.*, noting that "[t]he former action ... constitut[es] 'approval' sufficient to establish the first prong of the defense ... [while] the latter [is] characterized as 'rubber-stamping', action that indicates that the contractor, and not the government, exercised the actual discretion over the defective feature," *id.* The court then found that the evidence in the record before it showed that the Government had indeed approved reasonably precise specifications of the design feature at issue, a condenser fan on an air conditioning unit used by the United States Army to cool the Hawk Missile System Mobile Repair Unit which was alleged to be defective due to the lack of a wire screen to

---

**16.** The court stated:

The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government. If the government delegates the design discretion to the contractor, the exercise of that discretion does not revert to the government by the mere retention of a right of "final approval" of a design nor by the mere "approval" of the design without any substantive review or evaluation of the relevant design features or with a review to

determine only that the design complies with the general requirements initially established by the government. The mere signature of a government employee on the "approval line" of a contractor's working drawings, without more, does not establish the government contractor defense. The trier of fact should not evaluate the wisdom or quality of any government decision, but must locate the actual exercise of the discretionary function. If the government contractor exercised the actual discretion over the defective feature of the design, then the contractor will not escape liability via the government contractor defense—the government's rubber stamp on the design drawings notwithstanding.

*Trevino*, 865 F.2d at 1480.

cover the fan and protect against injury. After noting that the Government's specifications for the air conditioning unit neither provided for nor prohibited installation of this particular safety device, the court described the nature and extent of the design review engaged in by the Government. This included review and approval of the contractor's initial detailed engineering analysis; formal design review and approval by Army engineers of the contractor's preliminary design layout; and critical review and evaluation, over a period of several days, of detailed drawings from which each component of the unit would be fabricated, which drawings were subject to any changes desired by the Army. Further, the contractor was required to fabricate each part specified in the detailed drawings and build prototype models, which underwent extensive testing for several months by the contractor and the Army, which was followed by another month of review by the Army of the test results, after which the Army gave final approval to the design. *Id.* at 333, 335. The court noted with regard specifically to the condenser fan, i.e., the "design feature at issue," that the Army approved specifications prepared by the contractor amounting to over fifty pages of detailed design drawings, that the fan itself was built and incorporated into the prototype model that was tested and inspected by the Army before its approval for manufacture, and that the fan was virtually identical to the fan in a predecessor model of the unit which had been developed by the Army and used by the Army for ten years before the contractor's development of the newer design. *Id.* On these facts, the

court concluded that the contractor had immunity from the plaintiff's product liability suit.

■ In the case at bar, KVG contends that the review "approval" standard, as defined in *Trevino* and applied in *Stout,* is "easily satisfied." [17] Likening the case to *Stout,* it points out that KVG was required to submit its CCF design drawings for review at progressive stages; that the design was reviewed by as many as fifty Navy engineers and other specialists; that the Navy held several design review conferences to critique the details of the design; that the Navy required KVG to make changes throughout the course of the design; and that the final proposed design was itself subjected to intense scrutiny, resulting in KVG's having to respond to "hundreds of written criticisms" and comments by the Navy which challenged details of the project as seemingly insignificant as the color proposed for the battery room walls.[18] For their part, plaintiffs acknowledge that the Navy, through the Southern Division Naval Facilities Engineering Command, provided design criteria to KVG and oversaw the design of the CCF at the Meridian NAS; and they do not dispute that the Navy ultimately approved KVG's overall design for the CCF. They argue, though, that summary judgment may not be entered for KVG due to its failure to present proof of review of the design *for the hangar door controls.*

In the court's opinion, the record in this case reveals a level of governmental review of KVG's CCF design plan which more closely approximates the review found by the *Stout* court to qualify as government

**17.** The court does not find *Smith v. Xerox Corp.,* 866 F.2d 135 (5th Cir.1989), cited by KVG, to be especially illuminating. The court in *Smith* concluded, with little elaboration, that the first *Boyle* element was satisfied because the evidence established that the government actually supplied the relevant specifications and thereafter reviewed *and* then approved the drawings prepared by the contractor based on those specifications. *Id.* at 138. The level of governmental review was not discussed, presumably because the speci-

fications furnished by the Government were themselves reasonably precise. In the case at bar, the evidence as to what specifications were supplied, or dictated, by the Navy is disputed.

**18.** Whereas the plans drawn by KVG provided for peach colored walls, a government interior designer objected that the color was not masculine and should be changed.

"approval" than it does the "rubber stamping" of the contractor's design found in *Trevino.*[19] Nevertheless, the court concludes that summary judgment must be denied, for while the record obviously establishes that there was "substantive review" of the overall design for the CCF, the court is unable to conclude as a matter of law that the record establishes that there was "substantive review" of the particular design feature in question. KVG submits that such proof is not required, and that proof of review of the overall design for the project as a whole is all that is necessary; but the court concludes otherwise.

There is no question but that the government contractor defense protects government contractors from liability for design defects only where the government has "approved reasonably precise specifications" for the design feature which is claimed to be defective. *See Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518 (first two conditions "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself"). Thus, in the absence of proof that a Government official "considered" the "design feature in question," summary judgment would not be proper. *Snell v. Bell Helicopter Textron, Inc.,* 107 F.3d 744 (9th Cir.1997).

The plaintiff in *Snell* alleged that a helicopter designed by the defendant contractor crashed due to a design defect involving the main drive shaft. The district court entered summary judgment based on the *Boyle* defense since the evidence was undisputed that the government was significantly involved in and approved specifications for the design of the helicopter. The appellate court reversed because the district court had not addressed whether the design feature in question, i.e., the drive shaft and its components, was considered by a government officer, as re-

quired by *Boyle. Id.* at 747. The court observed:

Where government "approv[al] of reasonably precise specifications has been found as a matter of law, the evidence established exercise of judgment by the government in the design of the particular feature in issue." *See Butler,* 89 F.3d at 585 (Navy furnished precise specifications for construction and functioning of the shipboard "accommodation ladder in general and the [allegedly defective] padeye and link in particular" and controlled the entire development process, including testing and installation); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 998–99 (7th Cir.1996) (Marine Corps was actively involved in the design process of the MK–48 support vehicle and gave substantive input on the configuration of the fuel and exhaust system alleged to have been defectively designed), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1996) ; *Tate v. Boeing Helicopters,* 55 F.3d 1150, 1154–55 (6th Cir.1995) (Army initially developed and actively participated in the lengthy and intensive design process of helicopter tandem hooks which were alleged to be defective); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 71 (3d Cir.1990) (Army specifically approved and required in its contract the installation of the allegedly defective replacement ball bearing in a helicopter engine); *see also Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698, 701 (4th Cir.1989) (design details of "main landing gear at issue" reflected balancing of military and technological factors), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1318 (11th Cir.1989) (electrical system failure caused by wire chafing inherent in design of "all-electric fighter," known and accepted by Air Force), *cert.*

19. Of course, the fact that the Navy undertook any review at all of KVG's design for the CCF distinguishes this case from *Trevino.*

**592**

*denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990); *Perez v. Lockheed Corp. (In re Air Disaster at Ramstein Air Base, Germany),* 81 F.3d 570, 575 (5th Cir.) (modifications of engine pylons at issue made pursuant to Engineering Change Proposal requested and agreed to by Air Force), *modified on other grounds,* 88 F.3d 340 (1996).

*Id.* at 747–48.[20] Reviewing the evidence of record before the district court, the appellate court in *Snell* first held that because the "Detail Specification" for the helicopter furnished to Bell by the Government had left the design and placement of the drive shaft and its components to Bell, the "Detail Specification" would not support the application of the government contractor defense as a matter of law. *Id.* at 748 ("When only minimal or very general requirements are set forth for the contractor by the United States the [military contractor defense] is inapplicable.") (internal quotations and citations omitted). The court then addressed the evidence of the design review to which Bell's design was subjected. That evidence, which showed that Bell had prepared and submitted the drawings for the entire helicopter to the government engineers for examination, review and approval to ensure that the drawings were correct and met the Detail Specification, and which showed that each drawing was signed by a government representative to indicate approval, was held insufficient to establish "as a matter of law

that the government exercised its discretion with respect to the drive shaft and its components." *Id.* "On the contrary, the testimony of the Bell official in charge of dealing with the military about the design of the helicopter, who attended all of the design meetings, was that there were no discussions with the government about the design of the critical isolation mounts." *Id.* The court concluded that "[o]n [that] record a trier of fact could find that the government did not exercise judgment with respect to the design feature in question, the drive shaft and its components." *Id.*

In the case at bar, a closer question is presented as to whether a trier of fact could find that the Navy did not review and exercise judgment with respect to the CCF hangar door controls. Here, as contrasted with *Snell,* no one has testified or otherwise given evidence that there were "no discussions" between Navy and KVG personnel about the design of the door controls, plaintiffs' assertion to the contrary notwithstanding.[21] And there is undisputed evidence of substantive and detailed review of the CCF project as a whole which would, in the court's opinion, fairly support an inference that there was, in fact, substantive governmental review of the design of the hangar door controls, notwithstanding the lack of specific comment or discussion of this aspect of CCF design.[22] In the end, though—and again

**20.** That is true of *Stout,* too. Indeed, the *Stout* court expressly noted not only that the government had reviewed the overall design for the air conditioning unit but had also specifically reviewed and approved the design of the compressor fan, the particular feature of the unit which was alleged to have been defective. *See Stout,* 933 F.2d at 335.

**21.** Plaintiffs recite in their response to KVG's motion that there was "no substantive review or evaluation [by any government official] for the operating control system for the [subject] hangar door." In support of this assertion, they refer the court to the deposition of Effie Meletis, and declare, "Effie Meletis ... states 'no review of Hangar Door controls ever took place.'" The court reviewed not only the

specific pages of Meletis's deposition testimony referenced by plaintiffs, but the entire deposition, and found no such statement by Meletis. Based on the court's reading of the deposition, her testimony at most establishes she has no specific recollection of any discussions regarding the hangar door controls. She did not deny that there may have been such discussions; she simply did not recall having been involved in any such discussions. This is a far cry from the testimony attributed to Meletis by plaintiffs.

**22.** While a prerequisite to the application of the *Boyle* defense is proof that there was substantive review of the *relevant design feature* by a government official, that does not mean that there must be *direct* proof of actual

acknowledging that it is a close question—the court is unable to conclude *as a matter of law* that the government exercised its discretion with respect to the door controls. That issue is instead better left for the fact finder. *See Boyle,* 487 U.S. at 514, 108 S.Ct. at 2519–20 ("[W]hether the facts establish the conditions for the defense is a question for the jury."). Accordingly, the court concludes that KVG's motion for summary judgment on the basis of the government contractor defense should be denied.

■ While the court has concluded that summary judgment is not appropriate as to either of plaintiffs' claims against KVG on the basis of the government contractor defense, KVG argues that summary judgment should still be entered in its favor on plaintiffs' strict liability claim inasmuch as the CCF hangar doors were "fixtures," and not "products." The court agrees.[23] Mississippi's Products Liability Act, Miss. Code Ann. § 11–1–63, operates only to impose liability against manufacturers or sellers of "products," and the hangar door at issue in this case cannot appropriately be characterized as a "product." *See Moore v. Jesco, Inc.,* 531 So.2d 815 (Miss. 1988) (component parts of chicken houses were not "products," so action against designer of chicken houses based on strict products liability was barred as a matter of law). Accordingly, summary judgment will be entered for KVG on plaintiffs' strict products liability claim.

*PLAINTIFFS' MOTION TO STRIKE:*

A final motion now pending before the court for resolution is plaintiffs' motion to strike two of KVG's experts, Robert Farr and James Anderson. Having reviewed plaintiffs' motion and KVG's response, the court concludes that the motion is without merit and should be denied.

*CONCLUSION:*

Based on the foregoing, it is ordered that the United States' motion for summary judgment is granted. It is further ordered that Kirk Voich Gist's motion for summary judgment is granted in part and denied in part as set forth herein. It is finally ordered that plaintiffs' motion to strike is denied.

discussions and/or negotiations and/or comments with/by a government official concerning the specific feature. As the design review process is obviously not intended simply as a means to laud the contractor's design accomplishments but rather is intended to ensure compliance with relevant government criteria and to identify perceived design deficiencies, a particular design feature may evoke a response from the reviewing government official only if it is *not* acceptable. A feature that the government official found acceptable, or desirable, could well be expected to draw no comment at all. That is to say, requiring direct proof of substantive government review of the specific design feature in question might tend to deprive the contractor of the *Boyle* defense when he "got it right" the first time.

**23.** The court notes that plaintiffs have not responded to this argument.